**M. KRAMER MANUFACTURING CO., INC., Appellant,**

v.

**Hugh ANDREWS, et al., Tim Caldwell, Drew's Distributing, Inc., Drew's Distributing Co., and Lynch Enterprises, Inc., Appellees.**

**No. 84–1710.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1985.

Decided Feb. 6, 1986.

Rehearing Denied March 27, 1986.

Ralph Bailey, Greenville, S.C., (Bailey &
Hardaway, Greenville, S.C., on brief), for
appellant.

Wellington M. Manning, Jr., Greenville, S.C., (Dority & Manning, Greenville, S.C., on brief), for appellees.

Before RUSSELL and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This appeal involves a dispute over the right to manufacture and sell a computer video game—"Hi-Lo Double Up Joker Poker." Essentially, the plaintiff claims that the defendants infringed the plaintiff's copyright in the game by copying the computer program controlling the machinations of the video characters and by copying the audiovisual aspects of the game. In addition to its copyright infringement claim, the plaintiff asserts that the defendants falsely designated the origin of the defendants' version of the game in violation of section 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), and that the defendants competed unfairly with the plaintiff in violation of the common law.[1] When the plaintiff filed its complaint, it moved for a preliminary injunction, which was granted. Prior to trial, the injunction was vacated, and the district court tried the case without a jury, finding for the defendants. The plaintiff appeals, and we reverse.

## I. *Factual Background*

The facts of this case are quite complex and require careful explication. The plaintiff is M. Kramer Manufacturing Co., Inc., (Kramer Manufacturing), a New Jersey corporation having its principal place of business in New Jersey. Defendants Hugh Andrews, Jr. (Andrews) and Tim Caldwell (Caldwell) are citizens of the State of South Carolina. The other defendants, Drews Distributing Inc., Drews Distributing Co. (collectively Drews Distributing) and Lynch Enterprises, Inc. (Lynch Ent.) are South Carolina corporations.[2] Andrews is the president and sole shareholder of Drews Distributing; he thus controlled all Drews Distributing activities. Andrews is also the sole stockholder of Lynch Ent.

Kramer Manufacturing markets various electronic, coin-operated video games, including the game at issue here—an electronic card game based on draw poker. Lynch Ent. and Drews Distributing also manufacture and market various electronic, coin-operated video games, including games similar to those at issue here. In addition, Andrews operates a sister corporation, which is not a party to this suit, that installs and services the various video games sold by Lynch Ent. and Drews Distributing.

### A. *The Development of the Game*

The record does not clearly indicate the facts surrounding the origin of the video game or the copyright which is in dispute here. Being bound by the factual findings of the district court unless clearly erroneous, we have reviewed the record and essentially adopt its factual findings as herein set forth with our modifications as noted. The game, Hi-Lo Double Up Joker Poker, has gone through various modifications, as is typical of video arcade games. The original version of the game, which was actually a variation of the card game blackjack that displayed five cards, was created by Kramer, Robert Battaglia, and Bill Blair in late 1979. Battaglia was then an engineer employed by LJF Corporation (LJF), a New Jersey corporation engaged in the engineering and manufacturing of video games. James Foy was the principal of LJF, and he had hired Battaglia to engineer and Kramer to provide ideas for the development of a video arcade card game. Battaglia acted as the software designer, engineer, and programmer, while Kramer essentially provided the concepts upon

---

1. The plaintiff also asserted breach of a distributorship agreement between the parties. That claim was decided adversely to the plaintiff and it has not been pursued on appeal. The plaintiff has also abandoned its common law unfair competition claim and relied on the section 43(a) claim.

2. Jurisdiction was thus based on diversity, 28 U.S.C. § 1332(a) (1983). In addition, jurisdiction was based on 17 U.S.C. § 1338(a) (1983) for the copyright and trademark claims.

which the game was built. Although the game was developed by Battaglia and Kramer, the record is clear, as most noticeably evidenced by Kramer's own testimony, that LJF owned the rights to the original production model of what was eventually to become Hi-Lo Double Up Joker Poker. Despite LJF's ownership of the game from its inception, Kramer in fact marketed the game through Kramer Manufacturing.

After marketing the five card blackjack game, Kramer recognized the potential for profit in this business and entered into an arrangement with Pasquale Storino to form a New Jersey corporation called Computer Portrait Center (CPC), which marketed various electronic devices. The two of them, Storino and Kramer, were the sole owners of CPC. In addition to his association with Kramer, Storino was also a principal in Gametronics, another New Jersey corporation. LJF had sold various video games to Gametronics, and Kramer and Storino met through their mutual association with LJF.

Sometime prior to 27 October 1981, Battaglia, working for LJF, and with the cooperation of Kramer, completed a video game called Draw Poker II which had a different printed circuit board than prior games, included an attract mode unlike prior games, and included a split screen and play mode with jokers unlike prior games. Nevertheless, the testimony and documentary evidence is clear that Draw Poker II encompassed a prior version of the same game, Draw Poker I. That is, Draw Poker II was not an independent creation of the engineers who had created Draw Poker I but resulted from various and often subtle changes in the earlier version, Draw Poker I. The changes to Draw Poker I were made slowly and over a period of time; the total result of those changes being an almost complete transformation of Draw Poker I into Draw Poker II.

On 27 October 1981, LJF transferred by letter and for consideration all rights to Draw Poker II as it then existed to Kramer Manufacturing. The defendants have challenged the adequacy of the consideration, premising their challenge to the validity of

Kramer Manufacturing's copyright on that challenge, among others. Kramer testified, and his testimony was not contradicted, however, that although Kramer Manufacturing did not pay the entire contract price for the rights to Draw Poker II, LJF released him and his company from all obligations under the contract by accepting certain computer hardware and harnesses. In the absence of any evidence to the contrary, and doubting the standing of any of the defendants to challenge the adequacy of whatever consideration was exchanged for the rights to Draw Poker II, we find that the letter of 27 October 1981 effectively transferred all rights in Draw Poker II to Kramer Manufacturing.

Through Battaglia's guidance, Draw Poker II went through many more modifications and eventually evolved into the game that forms the basis for this suit: Hi-Lo Double Up Joker Poker. Battaglia left LJF in August, 1981, and on 31 August 1981 Battaglia became a full-time employee of Kramer Manufacturing. The revised version of Draw Poker I was then in what the parties refer to as revision G, with revisions H through K to follow. Soon after Battaglia joined Kramer Manufacturing, he completed the programming necessary to transform Draw Poker I into a marketable Draw Poker II. At the time of transfer of the rights to Draw Poker II to Kramer Manufacturing, as discussed above, Draw Poker II was not completely "integrated"; therefore, Battaglia's modifications were necessary prior to sale of the game to the public, and he made those modifications while in Kramer Manufacturing's employ. Draw Poker II was first manufactured in late 1981, and Kramer Manufacturing has since sold over 6,000 of the games.

The final changes to Draw Poker II, which resulted in the game Hi-Lo Double Up Joker Poker, occurred between November 1981, just after Battaglia left LJF, and February 1982. Kramer Manufacturing began marketing the game with the hi-lo double up feature in February, 1982. The hi-lo double up feature allowed a player,

after winning a hand, to choose to play "hi-lo" and double his "credits," or plays, if he correctly guessed whether the next card would be higher or lower than the card then appearing. On 15 April 1982, Kramer Manufacturing began marketing the final version of the game, Hi-Lo Double Up Joker Poker. This version was identical to the one marketed in February except it contained a "flashing card feature": a series of flashing cards rather than still cards indicated the player's hand. The audio-visual differences between Draw Poker II as of 31 August 1981, when ownership was transferred from LJF to Kramer Manufacturing and Battaglia left LJF for Kramer Manufacturing, and the Hi-Lo Double Up Joker Poker game sold in April, 1982 were changes in the attract mode to include the hi-lo double up feature, instructions for hi-lo double up in the play mode, the hi-lo feature itself with instructions as to which button to push to activate the optional game, and the series of flashing cards instead of still cards throughout the game.

### B. *The Relationship Between Andrews and Kramer*

In September, 1981, Andrews incorporated Drews Distributing for the purpose of distributing and servicing video game equipment. Andrews' association with Kramer developed out of Drews Distributing's sales of Kramer's video games. Drews Distributing bought various versions of Draw Poker I and II and Hi-Lo Double Up Joker Poker from Kramer Manufacturing. Andrews and Kramer often discussed the possibility, during their frequently combined vacation and business trips, of Drews Distributing becoming the exclusive licensee for the sale of Kramer Manufacturing's video games in either South Carolina or in what Kramer and Andrews termed the southeast area. Andrews prepared several drafts of an exclusive distributorship agreement and forwarded them to Kramer. None of those agreements apparently were satisfactory to Kramer, because he did not accept them. Instead, he modified some of the terms of the agreements. The record is unclear whether Kramer returned the agreements, as modified, to Andrews or kept them in his personal files. In any event, the record is clear that, as the district court found, Andrews and Kramer never agreed on mutual terms for the exclusive distributorship agreement and never entered into any distributorship agreement whatsoever, because the changes made to Andrews' proposal by Kramer were never accepted by Andrews. During 1982, the dealings between Kramer and Andrews amounted to approximately $1,400,000 worth of sales, about 98% of which represented sales of Hi-Lo Double Up Joker Poker.

In late 1982, recognizing the scope of the video game market as Kramer had earlier, Andrews began researching how to market and manufacture his own video poker game. First, and as a result of the lack of any definitive distributorship agreement, Andrews began marketing video poker games, similar to that produced by Kramer, from Electro Sport and Merit Industries, other video game manufacturers. In addition, Andrews began purchasing in September or October of 1982 *other* Hi-Lo Double Up Joker Poker games that were being sold by Hillside Gaming Corporation (Hillside) and SMS Manufacturing Corporation (SMS). The principal of SMS was Pasquale Storino, who was a co-principal with Kramer in CPC.

Thus, it is clear that the development, manufacture, and sale of the Draw Poker video game involved much shifting of alliances and business relationships. Storino and Kramer had been involved in the original development of the Draw Poker game when LJF was revising the initial backjack-based game. They, in fact, formed CPC to invest in the video game market expansion. At the same time, however, they were competing with each other through their respective corporations: Kramer was selling through Kramer Manufacturing and Storino was selling through SMS.

### C. *The Copying of the Game*

Andrews' second step toward establishing his market position was to attempt to manufacture his own Draw Poker game.

Toward that end, in August, 1982, he contacted Kenneth Lynch (Lynch), an electronics engineer. It is their activities that form the basis for Kramer's infringement claim. Lynch and Andrews formed defendant Lynch Ent. to develop a computer video game to compete with Hi-Lo Double Up Joker Poker. Andrews gave Lynch a printed circuit board containing ROMS[3] from which to create a video poker game. The board that Andrews gave Lynch for purposes of copying was marked "Copyright Applied For M. Kramer Manufacturing." Because of this marking Lynch refused to use that board to develop the game. Andrews subsequently supplied to Lynch a printed board and ROMS from an SMS game. Lynch copied that board, which was actually a copy of the Kramer game, and produced a game substantially identical to the Kramer game.

Although the games are similar, Lynch changed portions of the SMS game, which had been previously copied from the Kramer by changing the configuration of the board that holds the ROMS, changing some words in the audiovisual display, and by changing the design on some of the cards. Specifically, he inserted the name "Lynch Enterprises" in the attract mode, inserted the insignia "LE" on the back of the playing cards, and changed some of the wording in the attract and play modes. Lynch deleted the words "Be a big winner," "Don't go by, give it a try," "Take a shot" and inserted "Try your skill," "For fun and free replays," and "Skill points." In December 1982, Lynch sold sixteen of his games to a distributor in Pennsylvania; thereafter he sold only to Drews Distributing.

### D. *Copyright Registration*

Registration of the copyrights for the various games involved in this case is as convoluted as the facts surrounding the games' development. Kramer Manufacturing's 11 March 1983 application for regis-

tration of the audiovisual work in "Hi-Lo Double-Up Joker Poker" listed as a previous or alternate title the name "Hi-Lo Double Up Joker Poker with Flasher, Model III." The registration application also stated that the audiovisual work for which registration was requested was a derivative work, as defined under the statute, based on a "[n]ew compilation of text, and new and revised graphics, not appearing in prior models." The copyright was registered on 14 March 1983 as PAu 480–757. Kramer Manufacturing also submitted a copyright application for copyright of the audiovisual "Hi-Lo Double Up Joker Poker." It listed as an alternative or previous title the name Hi-Lo Double Up Joker Poker with Flasher, Model II. After the copyright office initially rejected that application because it contained no copyrightable graphics "in view of [a] recent registration for what [was] basically the same text," i.e., registration PAu 480–757, Kramer Manufacturing's attorney certified that the work submitted was a new compilation of previously copyrighted material. The copyright office then registered the audiovisuals for Model II under PA 168–068. Thus Kramer registered Model III (registration PAu 480–757) first, as a compilation of Models II and I, and then registered Model II (registration PA 168–068) as a compilation of earlier works on 28 March 1983.

Foy and Storino, however, had already obtained copyright registrations in the computer programs underlying the games. They had submitted an application for "Draw Poker/Joker Poker" on 19 October 1982. The copyright office registered the computer program in Draw Poker/Joker Poker, TXu 106–735, on 21 October 1982. On 19 October 1982, Foy and Storino also submitted a copyright application for Draw Poker/Joker Poker/Hi-Lo. The registration covering the computer program for Draw Poker/Joker Poker/Hi-Lo, TXu 106–736, was granted on 21 October 1982.[4]

---

**3.** For a description of ROMS *see Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 854, n. 1 (2d Cir.1982).

**4.** Foy and Storino also obtained copyright registration TXu 106–734 covering the computer program for Black Jack/Bonus 21, which apparent-

Based on the copyrights they had obtained in the computer programs, Foy and Storino, now acting through SMS, sued Kramer Manufacturing, Michael Kramer, and his wife Branda Kramer for copyright infringement "by reproducing, publishing, marketing and distributing without license or consent [of SMS, Foy, Storino, or LJF] certain video games ..." in the United States District Court for the District of New Jersey on 16 February 1983.[5] Two days after suit was filed against him by Foy and Storino, Kramer filed the contract assigning all rights to Kramer Manufacturing in the "hardware and software design of Draw Poker II between Kramer Manufacturing and LJF," which was signed by Foy, in the copyright office. A month later, Kramer filed and was granted his registration of the copyright in the audiovisual aspects of the games, as noted above. While being sued by Foy and Storino for copyright infringement based on registered copyrights in the *computer programs* that generated the audiovisual aspects of Hi-Lo Double Up Joker Poker, Kramer obtained a copyrighted registration in the *audiovisual* aspects of that same game. Thus, the copyright registration in the computer program was held by one party to the suit in New Jersey and the copyright registration in the audiovisual display that is generated by the computer program was held by another party to that same suit.

The result of these conflicting copyright registrations was settlement negotiations, and on 9 May 1983, a settlement agreement between Kramer Manufacturing, SMS, and LJF was executed. All parties to the suit released all other parties to the suit from any possible copyright infringement claims arising out of the video arcade games listed on an attached schedule.[6] · All parties also cross-licensed the others, a license that was termed a "nonexclusive worldwide license in perpetuity," to use the copyrights of any of the then existing games. They further agreed not to authorize any third party to manufacture or distribute any of the games except games that the authorizing party itself manufactured. Finally and most important to this litigation, Foy and Storino, through LJF and SMS, agreed not to pursue any copyright infringement claim they might have against Drews Distributing, Lynch Ent., or Andrews and agreed that Kramer Manufacturing would have the exclusive right to bring such suit. In the event Kramer or Kramer Manufacturing did not bring suit within 45 days, the right to sue would revert back to Foy and Storino or one of their related companies.

A month later, on 2 June 1983, Kramer Manufacturing brought the suit underlying this appeal against Andrews, Caldwell, Drews Distributing, and Lynch Ent. Kramer Manufacturing's complaint alleged that the defendants, by distributing copies of the game Hi-Lo Double Up Joker Poker, had infringed upon its copyright in "[t]he computer program and the audiovisual work displayed on the screen during all modes of the [g]ame's operation...." Complaint ¶ 8, *Kramer Manufacturing v. Andrews*, 83–1344–3 (D.S.C. filed June 6, 1983). Thus, Kramer Manufacturing alleged infringement of its copyright *in both the computer program and the audiovisuals* and attached a copy of copyright registration PAu 168–068, covering only the audiovisual work in Model II. The complaint also alleged that by copying Kramer Manufacturing's "distinctive art work" on the front glass panel of the game, by copying "the configuration of the console embodying the Game," and by copying the name Hi-Lo Double Up Joker Poker, the defendants had falsely designat-

---

ly was the initial game upon which all others are based.

**5.** *SMNS Manufacturing Corp. v. M. Kramer Manufacturing Co.,* Civ.Action No. 83–554 (D.N.J. filed February 16, 1983).

**6.** The games listed were Draw Poker Model I; Draw Poker/Joker Poker; Draw Poker/Joker Poker/Hi-Lo; Hi-Lo Double Up Joker Poker, also known as Hi-Lo Double Up Joker Poker with Flasher, Model II; Hi-Lo Double Up Joker Poker, Nonflasher, Model II; Joker Poker Model II; Video Poker Model II; Black Jack/Bonus 21; Black Jack Model I; Bonus 21, Model I; Bonus 21 Model II; Black Jack Model II; Super Dominos Model II; and Tic Tac Toe Model II.

ed the origin of their game in violation of section 43(a) of the Federal Trademark Act of 1946, 15 U.S.C. § 1125(a) (1983), and had competed unfairly.

Two days later, the district court entered a temporary restraining order preventing the defendants from manufacturing or distributing:

(1) any video card game embodying [Kramer Manufacturing's] copyrighted computer program and audiovisual work or any substantial copy thereof,

(2) any video card game containing all or substantially all of the features of [Kramer Manufacturing's] Hi-Lo Double Up Joker Poker video card game, and

(c) [sic] any video card game using the original artwork and characteristic console configuration of [Kramer Manufacturing's] Hi-Lo Double Up Joker Poker video card game or any similar artwork or configuration, or using the title "HI–LO DOUBLE UP JOKER POKER" or any similar title. . . .

The court also ordered Kramer Manufacturing to post a bond securing the defendants for any losses incurred as a result of the temporary restraining order and scheduled a hearing for 14 June 1983. After a subsequent hearing, which had been postponed on the motion of the defendant's counsel, the district court dissolved the temporary restraining order as improvidently granted. After trial without a jury, the district court issued an unpublished opinion finding for the defendants on all counts.

## II. *District Court Opinion*

The trial court opinion found for the defendants on the copyright claim by resolving several alternative holdings in their favor. First, the court examined the audiovisual content of Kramer Manufacturing's Hi-Lo Double Up Joker Poker to determine whether it contained any copyrightable material. Stating the law to be that "the registration for a compilation of derivative work only covers the copyrightable new material and not elements found in pre-existing published versions," the district court held Kramer Manufacturing's regis-

tration PA 168–068 covered only those copyrightable audiovisual elements that were not contained in the audiovisuals of any previously published version of the game. After reviewing Draw Poker Model I with attract mode, Joker Poker Model II with attract mode, and Hi-Lo Double Up Joker Poker with Still Card and comparing those previously published games with Hi-Lo Double Up Joker Poker with Flashing Card, for which registration PA 168–068 was obtained, the court found that "there is no copyrightable [sic] material which was not in pre-existing works, therefore, PA 168–068 is invalid. . . ." That is, the district court excluded from any possible copyright protection all material that had been published in prior works, thus limiting protection to those elements that were added in the latest revision. Specifically, the court found that the only difference between Hi-Lo Double Up Joker Poker with Still Card and Hi-Lo Double Up Joker Poker with Flashing Card was, as the names suggest, the addition of the flashing card feature, which is a series of cards with faces and symbols that flash rapidly in succession. Because it said all but the flashing card feature was contained in a prior published work, the district court excluded that pre-existing portion from copyright protection. The court further held that the flashing card feature was not copyrightable, because it amounted to only "an idea, concept or system of flashing cards," to which copyright protection is not extended under 17 U.S.C. § 102(b) (1983).

Although the above reasoning resolved the case in favor of the defendants, the district court also addressed whether any copyright that might exist was forfeited and whether any valid, non-forfeited copyright was infringed. The court held that, assuming Kramer Manufacturing possessed a valid copyright in the audiovisual aspects of the game, Kramer Manufacturing had forfeited that copyright by failing to affix a proper copyright notice on works distributed to the public. In addition, assuming that Kramer Manufacturing had a valid copyright, which had not been forfeit-

ed, the district court held that the defendants had not infringed that copyright. Finally, the district court found that any infringement that might have occurred was innocent.

■ The owner of a copyright forfeits that copyright by failing to affix proper notice, which consists of the symbol ©, the word copyright, or the abbreviation copy; the year the work was first published; and the name of the copyright holder. The plaintiff admitted that it did not affix a proper notice when the game was first published, but argued that the failure had been cured under 17 U.S.C. § 405 by its "reasonable efforts" to add copyright notice to the game. The district court rejected that argument by finding that

> there was no effort made to apply a proper notice to Plaintiff's games located in its regional warehouses; to add proper notices to games in the possession of distributors; nor to send out replacement programs that included a proper notice.... Kramer took corrective measures only with the new games and with circuit boards returned for servicing or replacement.

The district court reasoned that because "reasonable efforts" "should include the addition of notices on copies in the hands of a distributor" and because in those cases finding a reasonable effort, the individual provided to distributors stickers or labels for affixation to previously delivered copies, Kramer Manufacturing's efforts were not reasonable.

Addressing whether the defendants had infringed Kramer Manufacturing's copyright, assuming that copyright not to have been forfeited, the court analyzed the audiovisuals of the plaintiff's and the defendant's games and stated "there is a lack of substantial similarity between the Plaintiff's audio visual ... and Defendant's game...." The district court's analysis or comparison of the games is contained in one sentence of the opinion:

> "Here, Defendants used
>
> different phraseology in its audio visual presentation, modified the playing

cards, added 'LE' to the back of the cards, and inserted 'Lynch Enterprises, Inc.' into the attract mode of the game."

Based on that analysis, the court concluded that there was insufficient similarity between the two games to warrant a finding of infringement.

The court next concluded that any infringement which might have occurred was innocent infringement under 17 U.S.C. § 405(b), and thus, not actionable. The court reasoned that any infringement was innocent because when the defendants began to manufacture the game, none of plaintiff's games exhibited proper notice and Storino, Foy, and Kramer were all claiming rights to the game. Furthermore, Andrews had received an attorney's opinion letter indicating that Kramer did not possess copyrights in the game.

On the basis of these conclusions the district court dismissed Kramer's claims. From such decision, Kramer has appealed. We reverse.

### III. *Position of the Plaintiff*

Kramer Manufacturing raises several issues on appeal. It argues that because a registered copyright covers previous versions of the work that were completed by the same author, the district court erroneously excluded any copyrightable features of the predecessor games to Hi-Lo Double Up Joker Poker with Flashing Card when determining whether that game contained any copyrightable elements. Second, Kramer Manufacturing argues that because the record reflects that it added proper copyright notice to every game manufactured and sold after the omission of a proper notice had been discovered, the trial judge erroneously concluded that no reasonable effort had been made to attach a proper copyright notice to Kramer Manufacturing's game. Third, the plaintiff complains that the trial court should not have excluded the computer program that runs the video card game and produces the audiovisuals, but should have permitted Kramer Manufacturing to introduce the

computer program and compare its program with the program for the Drews Distributing game for the purpose of proving copying of the audiovisuals. Finally, the plaintiff contends that non-innocent infringement was established as a matter of law by Andrews' admission of copying a copy of plaintiff's computer program.

### IV. *Summary of Conclusions*

We find that Kramer Manufacturing did possess a valid copyright in the audiovisuals of the game, that the district court erred by not permitting the plaintiff to introduce the computer program for Hi-Lo Double Up Joker Poker for the purpose of proving copying, and that Kramer Manufacturing did expend a reasonable effort in attempting to attach a proper copyright notice to its games after discovering the omission of proper notice. Furthermore, we find error in the district court's determination as to innocent infringement. We first address the question of the copyrightability of plaintiff's audiovisuals.

### V. *Copyrightability*

We begin with a general review of the law of copyright as it has developed over the years. The right of copyright is a creature of federal statute, with its constitutional base in Article I, § 8, cl. 8. The first copyright statute under this constitutional grant was enacted in 1790. Since that time there have been a number of revisions or amendments, both by Congress

and in judicial decisions, in order to keep the Act in step with technological developments. For example, photographs received copyright recognition in 1884 (*Burrow-Giles Lithographic Company v. Sarony*, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349), and sound recordings in 1973 (*Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163). In 1976, after a period of gestation over some twenty years, the Congress enacted a complete revision of copyright law which represented Congress' response at the time to the startling developments recently made in technology and science.[7] This new Act, known as the Copyright Act of 1976 and codified in 17 U.S.C. § 101, *et seq.* represents the existing statutory authority for copyright. Subsequently, in 1980, that Act was amended to include expressly what had been generally assumed as implicit in the Act of 1976 itself that computer programs were proper subjects of copyright. The Amendment did this by including in the definitional section of copyrightable subject matter a definition of "computer program."[8] This Amendment also replaced section 117 of the 1976 Act with a new section limiting the exclusive rights given "authors" in copies of computer programs.[9] Accordingly, it is the Act of 1976 as so amended in 1980 which is controlling in this case.

Under the 1976 Act, copyright protection is granted "in original works of authorship

---

7. *See* House Report, 1976, U.S.Code Cong. & Ad.News, 5659, 5660–61 (hereafter cited as House Report).

8. The amendments of 1980 followed the Final Report of the Commission on New Technological Uses of Copyright Works (CONTU). That Report recommended:

 The new copyright law should be amended: (1) to make it explicit that computer programs, to the extent that they embody an author's original creation, are proper subject matter of copyright; (2) to apply to all computer uses of copyrighted programs by the deletion of the present § 117; and (3) to ensure that rightful possession of copies of computer programs may use or adopt these copies for their use.

 CONTU Report at p. 12 n. 16.

 The Amendments of 1980 conformed to these recommendations.

9. Prior to that amendment there had been some doubt whether a computer program was copyrightable under the Act of 1976 in view of the language of section 117 in that Act, which appeared to continue the status quo in copyright law for computer programs. The conflicting arguments on the point are well summarized in a Note, *Copyright Protection for Video Games: The Courts in the Pac-Man Maze*, 32 Clev.St.L. Rev. 531, 538 (1983 ed.). We are of the opinion that the reason for finding that computer programs were copyrightable under the 1976 Act, as set forth in the Note, are convincing. We agree that computer programs were copyrightable under the Act of 1976. Congress chose to make crystal clear by the Amendments of 1980 that fact, and we see no reason to review the earlier decisions on whether a computer program was copyrightable under the 1976 Act.

fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Section 102(a). One of the important purposes of this section, as declared in the legislative history, was to broaden the scope of fixation, an essential requirement for copyright medium of expression and, specifically to abrogate the "artificial" rule enunciated in *White-Smith Co. v. Apollo Co.*, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908), which precluded protection for works not embodied in human-readable medium. The House Report, in explication of this purpose, said that this section "makes no difference [in determining the existence of the required element of fixation] what the form, manner, or medium of fixation may be—whether it is in words, numbers, notes, sounds, pictures, or any other graphic or symbolic indicia, whether embodied in a physical object in written, printed, photographic, sculptural, punched, magnetic, or any other stable form, and whether it is capable of perception directly or by means of any machine or device 'now known or later developed.'" 1976 U.S.Code Cong. & Ad.News at 5665. The new section also declares in section 102(a) that "[w]orks of authorship [shall] include the following categories: ... (6) motion pictures *and other audiovisual works;....*" (Italics added) Finally, the traditional rule declared in *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed.2d 630 (1954) that copyright protection extended "only to the expression of the idea—not the idea itself" was codified in section 102(b) of the Act.

In section 101 Congress, inter alia, defined the term "audiovisual works" which had been identified in section 102(a) as a proper subject of copyright protection, thus:

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or *electronic equipment,* together with accompanying sounds, if any, *regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.* (Emphasis added) 17 U.S.C. § 101.

The definition demonstrates that "audiovisual works" inherently requires some type of machine or device and that such machine shall embody as a "copy" such work. The Act also provided that compilations and "derivative works," terms later defined, were proper subjects of copyright.

Even though "audiovisual works" are proper subjects for copyright, the actual copyrighting of such audiovisual works and their qualifying for copyright protection depends on whether the works meet the tests for originality and fixation, which are declared to be "[t]he two fundamental criteria of copyright protection" for any work. House Report at 5664. "Fixation," is defined in the definitional section of the Act thus:

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title ... if a fixation of the work is being made simultaneously with its transmission.

The term "fixation in tangible form," as thus defined, is restated in the statutory definition in the Act of "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material object, other than a phonorecord, in which the work is first fixed."

There is no definition for "originality" comparable to that for "fixation," in the Act. The legislative history, however, demonstrates that Congress purposely

omitted any such definition because it accepted the standards as "established [for originality] by the courts under the present copyright law [i.e., the Act of 1909]," though it did explain in that connection that "[t]his standard [did] not include requirements of novelty, ingenuity, or esthetic merit" and added that "there [was] no intention to enlarge the standard of copyright protection to require them." House Report at 5664.

■ As we indicated in the statement of facts, the plaintiff had applied for and had been granted a certification of copyright of its video game Hi-Lo Double-Up Joker Poker with *Flasher, Model* II, as a derivative work under the category of "audiovisual works." It is that copyright which it claims the defendants have infringed. Such copyright, thus granted by the Copyright Office, is prima facie proof of the validity of plaintiff's copyright, including the existence of the elements of originality and fixation. The defendants, in response to the plaintiff's charge of infringement raise a number of defenses challenging the qualifications of Kramer's work for copyright. The initial defense (1) was that plaintiff's work was not copyrightable because it was a "process," "system," "game," or "idea," and, therefore, not copyrightable under section 102(b), (2) it lacked originality, and (3) that, though not directly stated, there was a want of fixation. The defendants, in disputing the validity of such copyright on those grounds, have the burden of overcoming the presumption arising out of the granting of the copyright by the Copyright Office. 17 U.S.C. § 410(c); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1019 (9th Cir.1985); *Murray v. Gelderman*, 566 F.2d 1307, 1311 (5th Cir.1978); *Atari, Inc. v. Amusement World, Inc.*, 547

F.Supp. 222, 225 (D.Md.1981). The district court sustained all the claims of the defendants and found the presumption of validity rebutted. We examine the soundness of the grounds on which the district court rested its decision that the plaintiff's work was not copyrightable.

■ The district court found that the video game in this case was not copyrightable because it was a "system or manner of playing a game" or "description of a game" and was simply an "idea," and "game." It predicates this conclusion basically on subsection (b) of section 102.[10] We find such reliance unwarranted. We base this determination on the limited purpose of the subsection itself as stated in its legislative history. The Committee Notes accompanying such subsection recognized this limited scope of the subsection, declaring that, "Section 102(b) ... in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate, in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged." In effect, what Congress intended in this subsection was simply a codification of the statement made by the Supreme Court in *Mazer v. Stein*, 347 U.S. at 207, 74 S.Ct. at 465;[11] that copyright protection extended "only to the expression of the idea—not the idea," thus distinguishing between "idea" and "expression," between "methodology or processes" and "writings," and, in effect, between patentability and copyrightability. That this is the proper construction of the subsection is manifest from the language of the House Report (p. 5670): "Section 102(b) is intended, among other things, to make clear that *the expression adopted by the programmer is the copyrightable element in a computer pro-*

---

**10.** 17 U.S.C. § 102(b) provides:
 In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**11.** *Baker v. Selden,* 11 Otto 99, 101 U.S. 99, 25 L.Ed. 841 (1879), is sometimes cited for a narrower statement of the rule than *Mazer. But see* 1 M. Nimmer, *Nimmer on Copyright,* § 2.18 (D), 2–206 (1983).

*gram,* and that the actual processes or methods embodied in the program are not within the scope of the copyright law." (Emphasis added) The legislative purpose thus declared was to accord copyrightability to such of the computer program, whether represented in a video game or otherwise, as might be considered "expression" under the enlarged definition given such term in the fixation clause of the Act. And that is the construction which has been given the subsection in all the recent decisions.

◼ *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1250–51 (3d Cir.), *cert. denied,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984) is illustrative of these recent cases, which have held that computer programs [12] are not to be denied copyrightability as a "process," or "system," precluded from registration under section 102(b). In that case, the court, reversing a district court which had ruled similarly to the district judge in this case, 545 F.Supp. 812 (E.D.Pa.1982), said:

Franklin [the defendant] argues that an operating system program is either a "process," "system", or "method of operation" and hence uncopyrightable. Franklin correctly notes that underlying section 102(b) and many of the statements for which *Baker v. Selden* is cited is the distinction which must be made between property subject to the patent law, which protects discoveries, and that subject to copyright law, which protects the writings describing such discoveries. However, Franklin's argument misapplies that distinction in this case. Apple does not seek to copyright the method which instructs the computer to perform its operating functions but only the instructions themselves....

Since it is only the instructions which are protected, a "process" is no more involved because the instructions in an operating system program may be used to activate the operation of the computer than it would be if instructions were written in ordinary English in a manual which described the necessary steps to activate an intricate complicated machine.

After all, as the court in *Apple Computer, Inc. v. Formula Int'l, Inc.,* 562 F.Supp. 775, 780 (C.D.Cal.1983), *aff'd.,* 725 F.2d 521 (9th Cir.1984), stated *"all* computer programs [whether in a video game or other work] as embodied in ROMs and diskettes are designed to operate a machine in such a way as to ultimately produce some useful communication to the user—that is their purpose," i.e., *to express.* (Emphasis in text) Because of this, the fact that "the words of a program [as expressed through the computer program] are used ultimately in the implementation of a process should in no way affect their copyrightability." 725 F.2d at 524. That the method of expression is by way of a computer "device" or "machine" is immaterial in view of the revised language in the 1976 Act, which expressly brings within the standards of copyrightability communications made "with the aid of a machine." We find the plaintiff's work is not precluded from copyright under the provisions of section 102(b).

◼ The district court, also, suggests that, "video games" are never copyrightable and that for this reason the plaintiff's copyright which in effect covers a video game is invalid. Strictly speaking the game, the idea of the game, itself is not protected but the shape and characteristics of the cards and the "shapes, sizes, colors, sequences, arrangements and sounds [that] provides something 'new or additional over the idea'" are protected. *Atari, Inc. v. North American Phillips Consumer Electronics, Corp.,* 672 F.2d at 617. The decisions to this effect are so numerous that video games [13] may be validly copyrighted

---

12. "Audiovisual works" are in fact computer programs. *See* note 13, *infra,* and the definition of video audiovisual works in *Stern Electronics, Inc. v. Kaufman,* 669 F.2d at 855.

13. "Video games" are described in *Stern Electronics, Inc. v. Kaufman,* 669 F.2d at 853 "as computers programmed to create on a television screen cartoons [or images] in which some of the action is controlled by the player."

as "audiovisual works" under this reasoning that the court in *Midway Mfg. Co. v. Bandai-America, Inc.*, 546 F.Supp. 125, 139 (D.N.J.1982),[14] said: "It is also unquestionable that video games in general are entitled to copyright protections as audiovisual works," and the court in *Midway Mfg. Co. v. Artic Intern. Inc.*, 704 F.2d 1009, 1012 (7th Cir.1983) declared:

> We thus conclude that video games are copyrightable as audiovisual works under the 1976 Copyright Act and we note that every other federal court (including our own) that has confronted this issue has reached the same conclusion.

At the time of decisions in *Bandai* and *Artic*, the courts in *Atari, Inc. v. North American Phillips Consumer Electronics Corp.*, 672 F.2d 607, 615 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 856 (2d Cir. 1981); *Midway Mfg. Co. v. Dirkschneider* 543 F.Supp. 466, 479 (D.Neb.1981); *Atari, Inc. v. Amusement World, Inc.*, 547 F.Supp. 222, 226–27 (D.Md.1981); and *Midway Mfg. Co. v. Artic Intern. Inc.*, 547 F.Supp. 999, 1008–09 (N.D.Ill.1982) had clearly declared video games copyrightable as audiovisual works. We, accordingly agree with the court in *Bandai-America*, 546 F.Supp. at 139, that under the authorities copyrightability of video games as audiovisual works cannot be disputed.[15] Nor can it be denied that the plaintiff's works meet the statutory definition of audiovisual works.

■ The finding that the plaintiff's work was an "idea" within the contemplation of *Mazer* and section 102(b) is also untenable. *Mazer*, it is true, makes a distinction between "idea" and "expression" and declared that the former is not copyrightable whereas the latter is. It is sometime difficult to distinguish between the

two concepts of "idea" and "expression." In the computer area with which we are concerned in this case, *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir.), *cert. denied*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984), has formulated the accepted test for distinguishing between the two concepts. If there is only one way to express the idea, "idea" and "expression" merge and there is no copyrightable material. In this *Apple* follows the rule enunciated in *Morrissey v. Proctor & Gamble Company*, 379 F.2d 675, 678–79 (1st Cir.1967), a case cited and relied on by the district court in this case. But, on the other hand, as *Apple* states it: "If other programs can be written or created which perform the same function as [the programer's] operating system program, then that program is an expression of the idea and hence copyrightable," 714 F.2d at 1253. And, in the computer field "[t]here exists a virtually unlimited number of instruction sequences that would enable a programmer to construct a program which performs even the more basic algorithmic or mathematical procedures." Note, *Computer Copyright Law: An Emerging Form of Protection for Object Code Software after Apple v. Franklin*, 5 Computer L.J., 233, 251 (1984). It follows, therefore, that normally in the computer field, courts are concerned with expression and not idea, as those terms are defined in copyright law. This fact was recognized by the first court of appeals to review the copyrightability of video games as audiovisual works, operated as a computer program, *Stern Electronics, Inc. v. Kaufman*, 669 F.2d at 855. In that case, the Court said:

> Omni contends that Konami was entitled to copyright only the written computer program that determines the sights and

---

The copyright itself in that case, just as the copyright in this case, covered the subject "audio-visual works" and not the computer program as such.

**14.** For later developments in this case *see Bandai America, Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70 (3d Cir.1905).

**15.** *See also United States v. Gallo*, 599 F.Supp. 241, 245 (W.D.N.Y.1984), where a criminal indictment for conspiracy to infringe a copyright in video games as audiovisual works was upheld.

sounds of the game's audiovisual display. While that approach would have afforded some degree of protection, it would not have prevented a determined competitor from manufacturing a "knock-off" of "Scramble" that replicates precisely the sights and sounds of the game's audiovisual display. This could be done by writing a new computer program that would interact with the hardware components of a video game to produce on the screen the same images seen in "Scramble," accompanied by the same sounds. Such replication is possible because many different computer programs can produce the same "results," whether those results are an analysis of financial records or a sequence of images and sounds. A program is simply "a set of statements [i.e., data] or instructions to be used directly or indirectly in a computer in order to bring about a certain result," Pub.L. No. 96–517, § 10(a), 94 Stat. 3015, 3028 (1980) (amending 17 U.S.C.App. § 101 (1976)). To take an elementary example, the result of displaying a "4" can be achieved by an instruction to add 2 and 2, subtract 3 from 7, or in a variety of other ways. Obviously, writing a new program to replicate the play of "Scramble" requires a sophisticated effort, but it is a manageable task.

Plaintiff's work here was thus "expression" and not "idea" and section 102(b) did not preclude its copyrightability.

The district court next would invalidate plaintiff's copyright for lack of originality. Plaintiff's work is stated by the district court to be a derivative work and the plaintiff accepts the characterization.[16] In determining originality in a derivative work or a compilation, it is proper to look ordinarily only to those elements in the work which are original with the copyright claimant. This is the purport of section 103(b) of the Act: "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." As Professor Nimmer explicates the section: "If the underlying work is itself protected by copyright, then the copyright in the derivative work or collection will neither nullify nor extend the protection accorded to the underlying work. If the underlying work is in the public domain, a copyright in the derivative work will not render the underlying work protectible. Thus copyright in a derivative or collective work merely protects against copying or otherwise infringing the particular compilation or arrangement of a collective work, or the original contribution contained in the derivative work." 1 M. Nimmer, *Nimmer on Copyright,* § 3.04 at 3–15–6. It follows that, in resolving originality in this case, we are to look to the new material added to the underlying material in the derivative work by the plaintiff.[17]

The classic precedent for determining originality in copyright law is *Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 102–03 (2d Cir.1951). The court in that

16. Both a derivative work and a compilation are listed in the Act as proper subjects of copyright. The difference in the two concepts, has been phrased in the House Report as follows, p. 5670:
A "compilation" results from a process of selecting, bringing together, organizing, and arranging previously existing material of all kinds, regardless of whether the individual items in the material have been or ever could have been subject to copyright. A "derivative work," on the other hand, requires a process of recasting, transforming, or adapting "one or more preexisting works"; the "preexisting work" must come within the general subject matter of copyright set forth in section 102, regardless of whether it is or was ever copyrighted.

17. The plaintiff contends that, when the "author" has rights in the underlying work, as it asserts it has, that fact must be considered in resolving copyrightability for originality. It relies on *Rexnord, Inc. v. Modern Handling Systems, Inc.,* 379 F.Supp. 1190 (D.Del.1974) and on 2 M. Nimmer, *Nimmer on Copyright,* § 7.16[B][2] for this argument. We, however, find it unnecessary to this decision to resolve this issue in this case, since we are of the opinion the cause can be determined on the ground that the plaintiff's addition to the underlying work was sufficiently "original" to meet the standards for such term established in the decisions.

case said that in copyright law "[a]ll that is needed to satisfy [the originality requirement under] both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's addition", it is enough if it be his own." The Court in that case relied on and quoted extensively from *Henderson v. Tompkins,* 60 Fed. 758, 765 (C.C.D.Mass. 1894). cited with approval by the Supreme Court in *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903):

> There is a very broad distinction between what is implied in the word "author," found in the constitution, and the word "inventor." The latter carries an implication which excludes the results of only ordinary skill, while nothing of this is necessarily involved in the former. Indeed, the statutes themselves make broad distinctions on this point. So much as relates to copyrights * * * is expressed, so far as this particular is concerned, by the mere words, "author, inventor, designer or proprietor," with such aid as may be derived from the words "written, composed or made," * *. But a multitude of books rest safely under copyright, which show only ordinary skill and diligence in their preparation. Compilations are noticeable examples of this fact. With reference to this subject, the courts have not undertaken to assume the functions of critics, or to measure carefully the degree of originality, or literary skill or training involved.

In line with these principles, courts have said that in the copyright context the standard for originality of a compilation or derivative work is "minimal" and of "a low threshold," (*Original Appalachian Artworks, Inc. v. Toy Loft,* 684 F.2d 821, 824 (11th Cir.1982)), and is "modest at best" (*Thomas Wilson & Co. v. Irving J. Dorfman Co.,* 433 F.2d 409, 411 (2d Cir. 1970)). The requirement is satisfied if the new material or expression has what the Court in *Dan Kasoff, Inc. v. Novelty Jewelry Co.,* 309 F.2d 745, 746 (2d Cir.1962) said was a "faint trace of 'originality'" and if it provides a "distinguishable variation," *Merritt Forbes & Co. v. Newman Securities,* 604 F.Supp. 943, 951 (S.D.N.Y.1985). Compilations are excellent examples of the minimal nature of the originality requirement in the computer field. "Copyright protection may extend to such a compilation, even if the material of which it is composed is not copyrightable itself or is already subject to previous copyright"; it is sufficient "if original skill and labor is expended in creating the work. The mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable." *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 387–88 (5th Cir.1984). Thus, facts as such may not be copyrighted but, if there is originality in arrangement or selection of facts, such as in a telephone directory, the directory may be copyrighted. *Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128, 132 (8th Cir.1985); *Rockford Map Pub. v. Dir. Service Co. of Colo.,* 768 F.2d 145, 148–49 (7th Cir.1985); *Financial Information, Inc. v. Moody's Investors,* 751 F.2d 501, 507 (2d Cir.1984); *Eckes v. Card Prices Update,* 736 F.2d 859, 862–63 (2d Cir.1984); *West Publishing Co. v. Mead Data Control, Inc.,* 616 F.Supp. 1571 (D.Minn.1985); *Rand, McNally & Co. v. Fleet Management Systems,* 591 F.Supp. 726, 732–33 (N.D.Ill.1983), and 600 F.Supp. 933 (N.D.Ill. 1984). In *Rockford Map Publishers,* the Court said (768 F.2d at 148–149):

> If the incremental contribution is small, so too is the reward, but a subjective assessment of the importance of the contribution has nothing to do with the existence of copyright.

> The contribution of a collection of facts lies in their presentation, not in facts themselves. The collector may change

the form of information and so make it more accessible, or he may change the organization and so make the data more understandable. A catalog of names and addresses is copyrightable ... as is a directory of trade symbols ... and a compilation of logarithms.... In each case the copyright depended on the fact that the compiler made a contribution—a new arrangement or presentation of facts—and not on the amount of time the work consumed.

■ *Gelles-Widmer Company v. Milton Bradley Company,* 313 F.2d 143, 147 (7th Cir.), *cert. denied,* 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963), is particularly apt in this context since copyright protection in flashcards containing standard mathematical equations and their answers was upheld. The court held that the basic mathematical calculations were in the public domain and were not copyrightable but that "the basic materials and arithmetical problems may have been old and in the public domain, but we agree with plaintiff's argument that the arrangement, the plan and the manner in which they were put together by the author, does constitute originality." It is, also, important that, in reviewing a derivative work for originality, it is not sufficient to consider the matter by looking at the component parts: the work must be reviewed as a whole, not just reviewed or analyzed part by part. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d at 387–88.

■ The district court offers few clues to its standard for originality. The nearest it comes seems to be that for originality "true artistic skill is required" in the copyright context. It cites *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486 (2d Cir.1976) for this conclusion. It is true that *Batlin* does use the phrase "true artistic skill," but it was using it in connection with a copyright issued for a "work .of art." No doubt the language was appropriate in that connection but it is not relevant where the work is copyrighted as "audiovisual works," for instance. In *Gracen v. Bradford Exchange,* 698 F.2d 300, 304 (7th Cir.

1983), the court cautioned that "artistic originality is not the same thing as the legal concept of originality in the Copyright Act," and, in *Bleistein,* 188 U.S. at 251, 23 S.Ct. at 300, Justice Holmes warned that "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits." "Works of art" as a subject of copyright are specially defined in section 101 and have also been specially defined from time to time in the Rules and Regulations of the Copyright Office. *See Carol Barnhart, Inc. v. Economy Cover, Corp.,* 773 F.2d 411 (2d Cir. 1985). "Audiovisual works" have been separately defined in section 101 and in the decisions and are plainly different from the definition of "works of art" in the Act.

That the language in *Batlin* related explicitly to "works of art" is clearly inferable from the language by the same court in its discussion of *Batlin* in the later case of *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 910 (2d Cir.1980), at 910, in which the court, recognizing the obvious distinction between a "work of art" and other forms of expression, said the originality requirement in connection with a "work of art" is not satisfied by a "demonstration of some 'physical' as opposed to 'artistic' skill," and even more in *Carol Barnhart.* If "true artistic skill" were an absolute requirement for *all* copyrights— which is apparently what the district court assumed—many works, such as directories as in *Hutchinson Telephone,* 770 F.2d 128, or the maps in *Rockford Map Publishers,* 768 F.2d 145, or perhaps even flashing cards as in *Gelles-Widmer,* 313 F.2d 143, could not have been copyrighted.

■ The district court further seems to assume that, if the copyright work consisted *only* of the underlying works and if the various components of an underlying work were in the public domain and not copyrighted, then a derivative work could not be considered copyrightable under the originality test. In developing this thesis, the district court purported to review all the

underlying works involved in plaintiff's derivative work, *save the flashing cards,* and concluded all were in the public domain. It concluded, therefore, in line with its assumed rule of copyright law, that plaintiff's derivative work lacked originality and was not copyrightable. As the Court said in *Apple Barrel Productions,* 730 F.2d at 387–88, copyrightability of a compilation or derivative work does not turn on whether the component parts of the collective work are original or in the public domain. Section 103 of the Act makes this plain. It declares that the validity of a copyright of a compilation or derivative work depends on the originality of the compiler's individual contribution to the work or material regardless of whether the individual items in the material have been or ever could have been subject to copyright. It follows that the validity of plaintiff's copyright does not depend on the copyrightability of the components represented by the underlying work but by the originality of its own contribution to the copyrighted work.

Tested by the standards for originality established in the decisions and in the district court's own findings of fact, it is manifest that the plaintiff's work qualified as original under the Copyright Act. The district court found that the changes, additions, and modifications, which resulted in the Hi-Lo feature and which represented Kramer's additions to the underlying works, introduced a completely separate game, adding the flashing card feature in the play mode, which is a series of card faces with suits and symbols flashing rapidly in succession, and modifying the screen display, resulting in a split screen showing both the poker hand being played and the options available. Those changes and additions were not "trivial"; they demonstrated more than a "taint of originality." Unlike the backgammon board denied copyrightability for lack of originality in the leading case of *Chamberlin v. Uris Sales Corporation,* 150 F.2d 512, 513 (2d Cir.1945) in which the addition was said to have been "so minute as to escape the attention of the ordinary observer," the additions here were strikingly different and plainly discernible to the most casual observer. These undisputed facts, as found by the district court, establish that plaintiff's work met the test of originality under the Act. *See Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d at 132.

"Fixation" is an essential element of copyrightability in the same way originality is. The district court did not find expressly that plaintiff's work was not "fixed" and therefore uncopyrightable. It could, however, be argued that it did indirectly so rule and, before concluding a discussion of the copyrightability of plaintiff's work, it is in order for us to consider whether the district court did indirectly find an absence of fixation in plaintiff's work. This "indirect" ruling on fixation arose in connection with a pre-trial motion of the plaintiff. The plaintiff moved to be permitted to file an amendment alleging the issuance to it of a copyright for its computer program which implemented its audiovisual works. That motion was resisted by the defendants, who, in objecting, requested the district court to enter an order excluding from the evidence "Plaintiff's new copyright registration TXu 142–685 [plaintiff's computer program] and related allegations for inclusion at trial of this matter." The district court denied the plaintiff's motion and granted in full the defendants' motion. It based this ruling on the ground that the audiovisual aspects and the computer program which produces the audiovisuals are "separately copyrightable" and, because they are "separately copyrightable," an infringement action based on a copyright of the audiovisual works does not involve the computer program which implements the audiovisual works. It, therefore, held that any reference to such computer program would be inadmissible. Specifically, it concluded that the registration of the audiovisual works of the plaintiff did not cover "the underlying computer program." [18] If this ruling is correct, then the plaintiff's

---

18. The district court overlooked the fact that in its complaint the plaintiff charged infringement of both the computer program and the audiovisuals.

work would fail the fixation requirement, since it relies on the computer program to supply the essential element of fixation. For this reason it would seem that we should address this ruling in determining the copyrightability of plaintiff's work.

What the district court held, as we read its opinion, was that the audiovisual copyright protection granted the plaintiff under its initial copyright did not extend to the computer program which implements the audiovisuals. And it based this on the ground that the computer program may be separately copyrighted, as *Midway Mfg. Co. v. Strohon*, 564 F.Supp. 741, 749 (N.D. Ill.1983), held and as recognized by the plaintiff—at least since the 1980 amendments.

▇ But the fact that the computer program could have been separately copyrighted does not mean that the audiovisual copyright may not protect the computer program which implements the audiovisuals any more than the issuance of a patent will not necessarily render a work non-copyrightable, *see Mazer v. Stein*, 347 U.S. at 217, 74 S.Ct. at 470, and *Stern Electronics, Inc. v. Kaufman*, 669 F.2d at 856.[19] The computer program or "memory device" is the form in which the audiovisuals are "permanently embodied" and are fixed in a tangible medium of expression "capable of being" reproduced or otherwise communicated, "either directly or with the aid of a machine or device." The "memory device," or computer program, is an essential element of the audiovisual copyright, satisfying the "fixation" requirement for the issuance of a copyright and, as a "copy," *within the statutory definition, it is specifically protected from infringement under the audiovisual copyright. See* 17 U.S.C. § 106(1). As the Court said in *Kaufman*, "The [video game's] display satisfies the statutory definition of an original 'audiovisual work', and *the memory devices of the game satisfy the statutory requirement of a 'copy' in which the work*

is *'fixed.'*" (Emphasis added) To the same effect is *Williams Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870, 874 (3d Cir.1982); *Midway Mfg. Co. v. Dirkschneider*, 543 F.Supp. at 480; and *Atari, Inc. v. Amusement World, Inc.*, 547 F.Supp. at 226. In *Dirkschneider* the Court said (p. 480):

Under these statutory provisions, it is clear that the plaintiff's audiovisual works are fixed in the printed circuit boards. The printed circuit boards are tangible objects from which the audiovisual works may be perceived for a period of time more than transitory. The fact that the audiovisual works cannot be viewed without a machine does not mean the works are not fixed. The Court therefore is of the opinion that the plaintiff's audiovisual works are fixed, and thus may be copyrighted.

If that were not so, then the audiovisual copyright would be invalid because not "fixed in a tangible form" and, therefore, lacking the essential element of "fixation." Moreover, under the construction of the district court, most of the decisions sustaining video games as audiovisual works would be wrongfully decided, for, particularly in the early years, the "author" copyrighted only his audiovisual works and not his "memory device" or computer program.

As a matter of fact, the defendant in *Kaufman* contended that the audiovisuals were not copyrightable because they were not "fixed" and that "only the written computer program that determines the sights and sounds of the game's audiovisual display" was copyrightable, and that, since the computer program had not been copyrighted, the suit for infringement must fail for want of a valid copyright. 669 F.2d at 855–56. This argument is what in effect the district court concluded on this point. We agree with the Second Circuit that the argument is untenable. As we have said, the "memory device" or computer program qualifies as a copy of plaintiff's audiovisual

**19.** In *Mazer* the Supreme Court said (347 U.S. p. 217, 74 S.Ct. 470): "Neither the Copyright Statute nor any other says that because a thing is patentable it may not be copyrighted. We should not so hold."

work and *as such is protected under the plaintiff's copyright. See* 17 U.S.C. § 106(1). That was precisely what Judge Young held in *Amusement World* and we agree.

 It follows that the district court in this case could properly consider in connection with an alleged infringement of an audiovisual copyright both the audiovisuals and their implementing computer program. To be specific, we hold that a copyright in the audiovisual display, which display is created by a computer program, protects not only the audiovisual from copying, but also the underlying computer program to the extent the program embodies the game's expression. The program, as we have noted, is, by definition a "copy" under the Act, and the Act grants to the copyright holder the exclusive right to reproduce copies or derivatives of the copyrighted work. 17 U.S.C. § 106(1). When an infringer copies the computer program and reproduces the expression embodied in the audiovisuals, he has infringed the copyright holder's exclusive rights—this is the purport of the Act itself.

The district court raised two other minor points to support its finding of uncopyrightability in this case which, perhaps, should be noted. It apparently would impeach the issuance of plaintiff's copyright because the Copyright Office had earlier denied a copyright for the Foy/Storino work, a work which incidentally did not include the several variations, such as the "flashing cards," already noticed, an addition made in plaintiff's work. We fail to find any significance in the refusal of the Copyright Office to grant a copyright for another work which was significantly different from the one the Copyright Office later copyrighted. The important fact is that the Copyright Office did copyright the plaintiff's work as an audiovisual work. The district court also finds that the Copyright Office, even though it had issued a copyright for plaintiff's work, really agreed with the district court that the plaintiff's work was not copyrightable. The rationale for this conclusion seems to

be a feeling not directly expressed by the district court that the Copyright Office was in some way misled by plaintiff's patent counsel. The defendants' expert witness, on whom the district court appears to have relied heavily, and who was well versed in copyright practice, did not support this theory, nor did the district court find any reasonable basis for such a finding in the record. The expert witness however, advanced one equally implausible. He would fault the examiners in the Copyright Office by asserting that they recommended a copyright for plaintiff's work because it was a "new technology," that they didn't "know what to do with video games" because "[t]hey're not used to them" and that, for those reasons, the registration had no "greater significance than that." When at least three courts of appeals had already found video games copyrightable and stated the reasons for their conclusion, we find it impossible to conclude that the examiners in the Copyright Office were so unversed that they didn't know what to do with video games and therefore copyrighted them apparently out of frustration. Accordingly, we dismiss these contentions as without merit on the issue of copyrightability of plaintiff's work.

 From what has been said, we are of opinion that, based on settled principles of law and the undisputed facts in the case, the evidence conclusively sustained the validity of plaintiff's copyright. In *Hutchinson Telephone Co. v. Fronteer Directory Co.*, 770 F.2d at 132, the court, in sustaining copyrightability, said:

 Because we find these undisputed facts to establish that Hutchinson's directory is an original work of authorship we may decide the issue of copyrightability and no remand to the District Court on this issue is necessary. Where the facts on which an issue must be decided are undisputed, an appellate court may reverse on that issue without a remand. (citing case)

 We hold, therefore, that Hutchinson's telephone directory is an original work of

authorship and therefore is copyrightable under the provisions of 17 U.S.C. § 102. Such, also, is this case and we hold that plaintiff's work was copyrightable.

### VI. *Forfeiture*

 Having determined the district court's analysis and determination of the validity of the plaintiff's copyright to be in error, we must now address whether the district court properly found that copyright protection was forfeited due to the plaintiff's failure to place a proper copyright notice on the game. The omission of copyright notice places the work in the public domain unless the omission is excused under 17 U.S.C. § 405(a), which saves the validity of the copyright if:

(1) the notice has been omitted from no more than a relatively small number of copies or phonorecords distributed to the public; or

(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public. in the United States after the omission has been discovered. . . .

Kramer Manufacturing does not contend that it distributed "a relatively small number" of games without the proper copyright notice as contemplated under subsection (a)(1). There is, however, no dispute that the first requirement of subsection (a)(2) was met—Kramer Manufacturing registered its audiovisual copyright within five years of the first publication without proper notice. Kramer Manufacturing contends, and we agree, that the district court

erroneously concluded that it had failed to make a reasonable effort to add a proper copyright notice after discovering the insufficiency of the notice that was placed on the games.

Prior to the fall of 1981, the audiovisuals contained no copyright notice whatsoever. During that fall, Battaglia encoded into the underlying computer program the phrase "M. Kramer, Inc. 9–24–80" as an attempt at applying the proper copyright notice. That notice, though, lacked the requisite formalities,[20] since not being legible to an ordinary user of the work under normal conditions of use as required by 37 C.F.R. § 201.20(c)(1) (1984), (*see* 17 U.S.C. § 401(c) (authorizing Register of Copyrights to specify notice requirements) ), since the notice did not appear unless the game board buttons were pushed in an abnormal sequence. Later that year, Kramer placed the notice "Copyright applied for" on the outside of the ROMs contained within the game console upon the advice of an attorney. Contrary to the attorney's opinion, that notice was also formally deficient and improperly placed.

 In February 1983, Kramer Manufacturing discovered the insufficiency of the above notice and inserted a proper, visible notice into the attract mode of the audio visual display.[21] This is the date from which the determination of reasonable effort to give notice is to be judged. The district court held that Kramer Manufacturing's effort to add copyright notices after this discovery was not reasonable. The court gave as the sole reason for such finding that "there was no effort made to apply a proper notice to plaintiff's games

---

**20.** The notice must consist of a specified form: 1) the symbol ©, the word Copyright, or the abbreviation Copr.; 2) the year of first publication; and 3) the name of the copyright owner.

**21.** The defendants seem to argue that the discovery of the omission occurred simultaneously with insertion of the first improper copyright notice in 1981. Until 1983, the plaintiff considered the improper notice to be an effective copyright notice. It can hardly be said that the discovery of the lack of proper copyright notice occurred during that time. That the mistake

was a mistake of law and not the result of an inadvertent omission is of no moment. *Innovative Concepts in Ent., Inc. v. Entertainment Enter., Ltd.,* 576 F.Supp. 457, 461–62 (E.D.N.Y. 1983); *Shapiro & Son Bedspread Corp. v. Royal Mills Assoc.,* 568 F.Supp. 972, 976 n. 3 (S.D.N.Y. 1983), *aff'd in relevant part,* 764 F.2d 69, 73 n. 5 (2d Cir.1985)., Therefore, the discovery of the absence of proper notice occurred in 1983 and it is from that point that we judge the reasonableness of Kramer Manufacturing's efforts.

located in its regional warehouses; to add proper notices to games in the possession of distributors; nor to send out replacement programs that included a proper notice." The reasonableness of an author's effort to add copyright notice is generally a question of fact. 2 *Nimmer on Copyright* § 7.13[B][2]. We reverse this finding of the district court on which it rested its finding that Kramer's notice was not reasonable. We do so because, contrary to the district court's rationale for its conclusion, an author is not required as a matter of law to send out replacement programs; the district court's conclusion, resting as it does on a false legal premise that Kramer Manufacturing's effort was not reasonable was clearly erroneous. The statute requires only a reasonable effort to affix a proper notice to copies that are "distributed to the public .... after the omission has been discovered." The holder of copyright has no duty, based on this language, to add a notice to copies that have already been distributed and therefore has no duty to send out replacement programs for games that have already been distributed to the public. The reasonableness of Kramer Manufacturing's effort, therefore, is unaffected by its failure to replace ROMs that had already been distributed with ROMs bearing a proper copyright notice. Furthermore, even if we were to consider that lack of effort relevant to the reasonableness of Kramer Manufacturing's overall effort, Kramer testified that whenever a computer game board was returned for repair, the technicians would remove not only the defective ROM, but also remove all the ROMs that did not contain a proper copyright notice and replace them all with ROMs containing proper notice. Replacing those ROMs that were not defective and that had only been returned because they were an integral part of the console board exceeds the requirements of section 405(a)(2), because those ROMs had already been distributed to the public. Thus, there was no lack of reasonable effort on that account.

■■■■ Based on the statutory language, a copyright owner does have an obligation to add copyright notice to games that are stored or that have been distributed to retail dealers but not yet to the public. But, "[i]n any event, no more than 'a reasonable effort' need be expended in remedying the omission of notice on later distributed copies and phono records." 2 *Nimmer on Copyright* § 7.13[B][2]; *see also, Shapiro & Son Bedspread Corp. v. Royal Mills Associates*, 764 F.2d 69, 74 (2d Cir.1985). The trial judge was clearly in error to conclude that Kramer Manufacturing's effort was less than reasonable. The company had no retail distributors; it sold directly to the public. Although there were some games that were not yet in the hands of the consuming public, the uncontradicted testimony was that those games that were in storage were merely awaiting delivery. The company had sold those games as part of a lot sale and was merely awaiting payment on that portion of the lot that was in storage. The company acted immediately upon discovering the omission; there is no evidence that it dallied or sold any games after that discovery. *See Gemveto Jewelry Co. v. Jeff Cooper, Inc.*, 568 F.Supp. 319 (S.D.N.Y.1983). Furthermore, only three or four games were sold *prior* to the discovery of the omission of copyright notice but delivered after the discovery. Given Kramer Manufacturing's other efforts to attach notice, which included, in addition to that described above, stopping production of the game for a substantial period of time while a proper copyright notice was encoded in the ROMs controlling the audiovisual display, we hold that its efforts were reasonable as a matter of law, and we reverse the contrary findings of the district court. *See Videotronics, Inc. v. Bend Electronics*, 586 F.Supp. 478, 483 (D.Nev.1984).

### VII. *Infringement*

We now turn to the district court's findings regarding infringement, which we quote in full:

> Even if Plaintiff's copyright was valid and had not been forfeited, Defendants' acts would not constitute infringement.

In order to prove infringement of a copyright, it is necessary to prove ownership and that the Defendants copied Plaintiff's work. 17 U.S.C. § 106. Plaintiff may prove access plus substantial similarity in order to establish copying. *Midway v. Bandai, supra.* Access has been established which leaves the issue of substantial similarity for resolution. The scope of any alleged copyright in this case must be narrowly construed in order to prevent unnecessary restrictions on the public from using the idea or method of the game. *Atari v. North American Phillips Consumer Electronics,* 672 F.2d 607 (7th Cir.1982). Here, Defendants used different phraseology in its audiovisual presentation, modified the playing cards, added "LE" to the back of the cards, and inserted "Lynch Enterprises, Inc." into the attract mode of the game. The Court is of the opinion that there is a lack of substantial similarity between the Plaintiff's audiovisual in its Hi Lo Double Up Joker Poker with Flashing Card and Defendants' game and there would be no infringement even if the copyright was valid.

As we have seen, the plaintiff's copyright in the game's audiovisuals protects not only the audiovisuals, but also the computer program, which is embodied in the ROM and, in which the audiovisual is fixed, because the audiovisuals may be reproduced from the ROM with the aid of a microprocessor. Because the audiovisual is fixed in the computer program, the computer program underlying the audiovisual constitutes a copy of the audiovisual. It necessarily follows from that holding that the audiovisual copyright may be infringed in one of two ways: The infringer may copy the audiovisuals themselves or the infringer may copy the underlying computer program. In this case the undisputed evidence conclusively establishes that the defendants copied both.

■ Copying is ordinarily, due to the lack of direct evidence, established by proof that the defendant had access to the plaintiff's work and produced a work that is substantially similar to the plaintiff's work. 3 *Nimmer on Copyright* § 13.-01[B]. That the defendants had access to both the audiovisuals and the underlying computer program is not denied in this case. Thus the district court addressed only whether the defendants game was substantially similar to Kramer Manufacturing's game, that is, whether sufficient *indirect* evidence of copying was presented. The district court, however, lost sight of the ultimate issue—whether Drews Distributing copied the plaintiff's game. If there was clear proof of actual copying by the defendants, that is the end of the case. As we have said, because evidence of actual copying is usually not available, infringement or copying is proved indirectly, through proof of access and substantial similarity. This case is unusual, however, in that compelling substantial direct evidence of copying was presented. Furthermore, the district court, when determining whether the two games were substantially similar, analyzed only the audiovisual portions of the game. As discussed above, the audiovisual copyright also protects the underlying computer program.

■ Andrews first provided Lynch with a ROM that was clearly marked with Kramer Manufacturing's name, albeit an improper copyright notice. Because Lynch refused to copy that ROM Andrews procured another ROM, ostensibly from SMS, which was, in fact, a copy of the Kramer Manufacturing ROM. We have held that the ROM is a copy, within the meaning of the copyright act, of the audiovisual display of the game. Because the ROM is also an embodied copy of the computer program, *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1248 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870, 877 (3d Cir. 1982), evidence regarding the similarity of both the audiovisual displays of the two games and the similarity of the underlying computer programs is relevant to the issue of copying. An examination of the comput-

er program print-outs in the record establish this beyond question that Lynch, acting upon the ROM provided by Andrews, copied Kramer Manufacturing's game. That the copy employed by Lynch did not bear Kramer Manufacturing's legend is of no moment. The similarities between the two programs in the record are so striking that no other conclusion is possible but that Lynch copied Kramer Manufacturing's game. Copying a copy of a protected work cannot insulate one from infringement under the copyright laws. *Pye v. Mitchell*, 574 F.2d 476 (9th Cir.1978).

The computer programs in the record are virtually identical. The dissimilarities between the plaintiff's program and defendants' alleged infringing program appear quite obviously to be the result of a studied effort to make minor distinctions between the two works or, as the court in *Tennessee Fabricating Co. v. Moultrie Manufacturing Co.*, 421 F.2d 279, 284 (5th Cir.1970), put it, "to appropriate the plaintiff's design either outright or by frivolous variation." That effort, in itself, constitutes compelling evidence of copying. *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 618 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 14 L.Ed.2d 145 (1982); *Joshua Meier Co. Albany Novelty Manufacturing Co.*, 236 F.2d 144, 146 (2d Cir. 1956). As we previously noted, Kramer Manufacturing embedded in its program a hidden legend that would appear only when the game's buttons were pressed in an abnormal sequence. The defendants' program shows that the legend is included in its copy. That reappearing legend combined with the almost complete duplication of many lines of the object code print-out except for the wording appearing on the display screen establishes that Lynch copied the plaintiff's game. *Williams Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870, 876 n. 6 (3d Cir.1982). The fact that the defendants "added 'LE' to the back of the cards and inserted 'Lynch Enterprises, Inc.' into the attract mode of the game"—a fact which largely prompted the district court to conclude there was not "substantial similarity" in the two programs—demonstrates a manifest attempt to indicate that the program was different than the plaintiff's. The flaw in this reasoning is exposed by the hidden legend in plaintiff's program which is duplicated in defendants' program. The inclusion of this legend proves conclusively the copying. The courts have consistently viewed evidence of "common errors" as the strongest evidence of copying. *See Callaghan v. Myers*, 128 U.S. 617, 662, 9 S.Ct. 177, 190, 32 L.Ed. 547 (1888); *Rexnord, Inc. v. Modern Handling Systems, Inc.*, 379 F.Supp. 1190, 1194 (D.Del.1974); *Pic Design Corp. v. Sterling Precision Corp.*, 231 F.Supp. 106, 111 (S.D.N.Y.1964). Although the reproduction of an error in a directory may result from copying from an independent source or coincidence, the appearance of the hidden legend, "9–24–80 M. Kramer Mfg.," in the defendants' game could not result from anything other than copying the plaintiff's game or a copy of that game. We find this evidence of a hidden legend to be conclusive proof of copying and of infringement.

## VIII. *Claim of Innocent Infringement*

We also reject the district court's conclusion that any infringement that occurred was innocent under 17 U.S.C. § 405(b). The court reasoned that because the plaintiff's games did not display a proper copyright notice, because three people (Kramer, Foy, and Storino) were all claiming copyright in the game, because Andrews had received an opinion letter which stated that Storino, if anyone, had paramount rights in the game, and because three entities were manufacturing the game when Andrews first began manufacturing the game, any infringement that might have occurred was innocent. While it is true that under section 405(b) an innocent infringer who relies on an omission of copyright notice is immune from damages accrued up to the time he received actual notice, the statute expressly requires the infringer to prove that he or she was misled by the omission of notice. *Sygma Pho-*

*to News, Inc. v. High Society Magazine, Inc.*, 596 F.Supp. 28, 31 (S.D.N.Y.1984); *Aitken, Hayen, Hoffman, Miller, P.C. v. Empire Construction Co.*, 542 F.Supp. 252, 260 (D.Neb.1982). "The underlying postulate of the provision is that one acting with a good faith assumption 'that a work is in the public domain' and is not copyrightable should be shielded from unreasonable liability. [citation omitted] However, section 405(b) requires that the innocent infringer show he acted 'in reliance upon an authorized ... [copy] from which the copyright has been omitted,' and prove he was misled by the omission. 17 U.S.C. § 405(b)." *Ruskin v. Sunrise Management, Inc.*, 506 F.Supp. 1284, 1289 (D.Colo. 1981). The section is obviously designed to protect one who relies on a work that appears to be in the public domain and the copyright owner subsequently discovers and cures the omission pursuant to section 405(a).

■ Although the innocence of the defendants was a question of fact to be determined by the trial court, we are convinced that its conclusion was clearly erroneous. Andrews and Lynch most certainly had "reason to think," H.R.Rep. No. 1476 at 148, U.S.Code Cong. & Admin.News 1976, p. 5764, that the computer program was not in the public domain. They admit that three people, including the plaintiff in this case, were claiming copyrights in the game. Furthermore, they received a letter in December of 1982 which indicated that Kramer was claiming a copyright in the game. Most importantly, Lynch refused to copy the first ROM that Kramer produced because it carried the Kramer Manufacturing name, albeit in an improper form to satisfy the notice requirements of the copyright laws. Given these facts we find it impossible to conclude that the defendants relied on the lack of notice to conclude that the work was in the public domain. They most certainly knew that many people were claiming rights in the game, one of whom was the plaintiff. While it may be that the defendants believed that Kramer did not own a valid copyright in the game, the evidence is clear that they were not misled by the lack of proper copyright notice when they knew that various parties were claiming copyrights in the game.

### IX. *Trade Dress Infringement*

We now turn to the plaintiff's trade dress infringement claim. The plaintiff claims that the defendants, by copying the console in which the game is housed, the artwork on the glass panel upon which the video graphics are displayed, and the name "Hi-Lo Double Up Joker Poker", violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1983).[22] The district court held that because "[t]he [p]laintiff ... failed to prove that the public has come to recognize its console design as indicating that games housed therein originate from or are connected with a single source[,] [n]o 'secondary meaning,' which is a prerequisite to proof of alleged proprietary rights, has been attached to [p]laintiff's console." The court similarly found that Kramer Manufacturing did not prove that any secondary meaning had attached to either the name or the glasswork of the game.

■ Kramer Manufacturing insists, relying primarily on *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960), that the requirement of secondary meaning is satisfied by proof of the defendant's intentional copying of the trade dress of the plaintiff's product. *Cf. Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950

---

**22.** That section provides as follows:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any persons who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

(2d Cir.1981). The defendants contend that the trial court was right on both the law and the facts: evidence of copying is not sufficient to establish secondary meaning and no facts regarding the public's identification of the game's trade dress with any particular producer were presented.[23] We hold that evidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue, and, since the defendants have offered no credible evidence rebutting this presumption, the infringement is established.[24]

Section 43(a), although enacted as part of the trademark protection act, does not apply exclusively to infringement of registered trademarks. Rather, the statute protects against certain deceptive practices whether or not a trademark is involved. *Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing Co.*, 510 F.2d 1004, 1012 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). To enjoin a competitor's use of a particular trade dress,[25] a plaintiff must show two things: that his own trade dress has acquired a secondary meaning and that there is a like-

**23.** Citing *Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir.1982), defendants also argue that Kramer Manufacturing should be "judicially estopped" from asserting this argument on appeal because it was not asserted below. While it is generally true that a party may be precluded from asserting a position contrary to one asserted in a prior proceeding, a fair reading of *Allen v. Zurich Ins.* makes it clear that the doctrine of judicial estoppel is wholly inapplicable here. The purpose behind the rule is to prevent a party from "playing fast and loose" with the courts, *Allen v. Zurich Ins.*, 667 F.2d at 1166, or from "convincing unconscionably one judicial body to adopt factual contentions only to tell another judicial body that those contentions [are] false." *Konstantinidis v. Chen*, 626 F.2d 933, 938–39 (D.C.Cir.1980). Plainly those concerns are not present in this case. The plaintiff is merely arguing that the district judge was wrong on the law. "Indeed, if deemed necessary to reach the correct result, an appellate court may *sua sponte* consider points not presented to the district court and not even raised on appeal by any party." (Quoting *Washington Gas Light Co. v. Virginia Electric & Power Co.*, 4th Cir., 438 F.2d 248, 250–51), *Ricard v. Birch*, 529 F.2d 214, 216 (4th Cir.1975).

**24.** Kramer Manufacturing also would have us hold that intentional copying establishes the second prong under section 43(a), likelihood of confusion. Because the district court did not address whether a likelihood of confusion between the defendants' and the plaintiff's games existed due to their similarity, and because the parties have not fully briefed or argued the issue, we do not decide such issue. We note, however, that the leading commentator on the subject states that the courts almost unanimously presume a likelihood of confusion based upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress. 2 J. McCarthy, *Trademarks and Unfair Competition* §§ 23:34–:35 (2d ed. 1984). *See also War-*

*ner Brothers, Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246–47 (2d Cir.1983) (evidence of intentional copying raises a presumption of likelihood of confusion, but may not in all cases survive a directed verdict); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859 n. 13 (11th Cir.1983) (intentional copying is "evidence, but not conclusive" on issue of likelihood of confusion); *Processed Plastic Co. v. Warner Communications, Inc.* 675 F.2d 852, 857 (7th Cir.1982) (intentional copying establishes presumption of intent "to create a confusing similarity of appearance and to have succeeded at doing so"). Among the factors to be considered when deciding this factual issue in a trademark case are "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, i.e., retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, *e.g.* does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir.1984) (citation omitted). *See also* 1 J. McCarthy, *supra*, at § 15:10–:26.

**25.** Unlike trademark infringement, which focuses on one aspect of a product's "image," i.e., the trademark, trade dress infringement focuses on "the total image of plaintiff's product, package and advertising and compare[s] this with the defendant's image." 1 J. McCarthy, *supra* note 30, § 8:1, at 282–83. The underlying purpose of section 43(a) is to protect both consumers and competitors from a wide variety of misrepresentations of products and service, implicating "a broad spectrum of marks, symbols, design elements and characters." *Warner Brothers v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981).

lihood that the defendant's use of that trade dress will confuse the public. 1 J. McCarthy, *Trademarks and Unfair Competition*, § 8:1–:2 (2d ed. 1984). If a particular product's trade dress has acquired a secondary meaning, then the consuming public associates that product with a certain producer, and, most importantly, is likely to make that same association when the trade dress is used on another producer's product. The public need not be able to identify the name of the manufacturer that produces the product; it is enough if the public perceives that the product emanates from a single source. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir.1982). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citations omitted).

The issue with which we are faced is the effect of a showing that the defendant deliberately copied the plaintiff's trade dress. The district court found that the glass frontpiece for the Kramer Manufacturing game was sent to a silk-screener by Andrews or someone at Drews Distributing and was used to create the glass frontpiece for their game. Andrews testified that when he first saw the design for the frontpiece even he was concerned about their similarity. The only difference between the two games is a change in the color of the lettering "Hi-Lo Double Up Joker Poker." The bottom half of the letters on the Drews Distributing model are silkscreened blue while the letters on the Kramer game are silkscreened either red or a combination of red and blue. Other than slight differences in color and shadings, which result from slight changes in the silkscreening process, the two glass frontpieces are identical. It is clear beyond doubt that Drews

Distributing copied Kramer's frontpiece. There is testimony, too, that the Kramer console was sent by someone at Drews Distributing to a cabinetmaker who duplicated it for Drews Distributing's use.

Some courts have held that evidence of "palming off," or an intentional effort to induce retailers to substitute his product for other products requested by consumers, is presumptive proof of secondary meaning. *Norwich Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569, 571–72 (2d Cir.1959), *cert. denied*, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960). For trademark infringement, the courts have held that evidence of deliberate copying establishes a prima facie case of secondary meaning, subject to rebuttal by the defendant, with the defendant bearing the ultimate burden of proof once deliberate copying is proven.[26] *Audio Fidelity, Inc. v. High Fidelity Recording, Inc.*, 283 F.2d 551, 558 (9th Cir.1960) (quoting *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2d Cir. 1934) (L. Hand, J.) ), *cert. denied*, 371 U.S. 934, 83 S.Ct. 306, 9 L.Ed.2d 270 (1962). The rationale for this presumption is that when a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark. *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir.1981) (quoting *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 563 (2d Cir. 1953) (L. Hand, J.) ), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).

The Second Circuit has held that, under New York law, proof of secondary meaning is not required if the defendant deliberately copied the plaintiff's trade dress. *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981). The rationale for this rule for trade dress is, in addition to the above rationale, that because the possible packaging and trade dress alternatives available

---

**26.** The courts have also held that sufficiently distinctive trade dress, upon use in the market, is presumed to serve as an identifier of source without proof of secondary meaning. *Chevron*, 659 F.2d at 702–03.

are many, monopolization is not a concern in this area. As the secondary meaning rule was designed to limit the extent a producer could monopolize a particular mark, it is therefore inapplicable. *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 953 (2d Cir.1980). If the plaintiff shows that the defendant intentionally copied the plaintiff's trade dress, then the burden is upon the defendant to prove a lack of secondary meaning. *cf. Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.,* 716 F.2d 854, 859–60 (11th Cir.1983). This burden the defendants have not borne. Judgment must issue in favor of the plaintiff on this issue.

█ In summary, we find and hold that the undisputed evidence compels the conclusion of infringement by copying on the part of the defendants. *See Hutchinson Telephone Co. v. Fronteer Directory Co., supra,* 770 F.2d 128.

### CONCLUSION

The judgment herein is vacated and the cause is remanded to the district court for further proceedings conforming to the decision herein.

**VACATED AND REMANDED.**