**RACO CAR WASH SYSTEMS, INC., Plaintiff,**

v.

**Walt SMITH, Bill Stieren, James Smith, Jerry Lee Smith, S–4 Car Wash, Inc., Galesburg Manufacturing Company, individually and d/b/a Water Wiz Car Wash, Defendants.**

Civ. A. No. 2:87–1967–1.

United States District Court,
D. South Carolina,
Charleston Division.

July 21, 1989.
Post Trial Motions Dec. 7, 1989.

Charles Baker and Keating L. Simons, Holmes & Thomson, Charleston, S.C. (Paul M. Johnson, Tulsa, Okl., of counsel), for plaintiff.

G. Dana Sinkler and Donald G. Mulack, Sinkler & Boyd, Charleston, S.C., and Malcolm McCaleb, Jr., Chicago, Ill., for defendants.

## ORDER

HAWKINS, District Judge.

This is an action charging the defendants with trademark infringement, trade dress infringement, unfair trade practices, and copyright infringement. Defendant Galesburg Manufacturing Company has asserted a counterclaim seeking a declaration that it is not infringing any of the plaintiffs rights and that the plaintiff's U.S. Trademark # 1,356,031 is invalid.[1]

1. Originally, Galesburg's counterclaim contained additional causes of action but those

Upon the recommendation and consent of the parties, the court bifurcated the trial of this action. The liability portion of the case was tried before this tribunal, sitting without a jury, commencing on May 24, 1989 and ending on June 2, 1989. Following the presentation of its case-in-chief, the plaintiff voluntarily dismissed its claims against defendant James Smith and defendant Jerry Lee Smith. The court, having considered the testimony and the exhibits admitted at trial and the proposed findings of fact and conclusions of law submitted to the court following trial, makes the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. The plaintiff, Raco Car Wash Systems, Inc. (Raco), is a Missouri corporation with its principal place of business in Joplin, Missouri.

2. The defendant Walt Smith is a resident of Illinois.

3. The defendant Bill Stieren is a resident of Illinois.

4. The defendant, S–4 Car Wash, Inc. (S–4), is an Illinois corporation that owns and operates two car washes in Charleston County, South Carolina. Defendant Smith and Defendant Stieren are the stockholders, directors, and officers of S–4.

5. The defendant, Galesburg Manufacturing Company, Inc. (Galesburg), is an Illinois corporation with its principal place of business in Galesburg, Illinois. Galesburg is a wholly owned subsidiary of SMS Enterprises, Inc. (SMS), which is itself a wholly owned subsidiary of Galesburg Holdings, Inc. (Galesburg Holdings). Defendant Smith and Defendant Stieren each own fifty percent of Galesburg Holdings, and serve as directors and officers of Galesburg.

6. Raco is a company that manufactures and sells automatic and self service car wash systems. Prior to 1967, Ray Al-

claims were voluntarily dismissed during the pretrial conference.

burty, the founder of Raco, operated a car wash in Joplin, Missouri. After becoming familiar with the equipment then available, Mr. Alburty decided to design his own automatic equipment. His efforts produced an automatic car wash that cleans vehicles with highly pressurized water rather than with brushes.

7. The necessary pressure is achieved by forcing the water through high pressure water nozzles, which are mounted in a device known as a trolley. The trolley, which is fashioned in the shape of an inverted "L", is installed on an elliptical monorail track. This design feature allows the trolley to spray water and soap on all sides of a stationary vehicle. [In addition to the shape of the trolley and the location of the nozzles, the Raco automatic is characterized by the distinctive size, shape, and configuration of the following elements: the monorail track; the currency meter, the guide rails, the guide light, the wheel wash assembly, and the signage.] Although other manufacturers have produced a similar product using different designs, the design of the Raco automatic is both efficient and effective. The evidence of record demonstrates wide variation in the size, composition, color, and signage of the buildings in which Raco equipment has been installed.

8. The features offered by the Raco automatic remained essentially unchanged for approximately three years. Then, in 1970, Alburty developed a system that rinsed vehicles with demineralized water so that they would dry naturally without leaving spots. The record indicates that although Alburty did not invent the process by which dissolved minerals are removed from water, he was the first person to adapt that technology for use in the car wash industry. Moreover, it is clear from Raco's success and longevity that the demineralized rinse feature is popular among consumers of car wash services and purchasers of car wash equipment.

9. From 1967 until 1971, Ray Alburty, d/b/a the Ray Alburty Company, designed and constructed car wash equipment under the trade name E–Z Car Wash, and a label bearing that name was affixed to the equipment. In 1971, Mr. Alburty changed the name of his company to Raco and began manufacturing car wash equipment under that trade name. Between 1967 and 1978 Ray Alburty sold approximately 100 automatic car wash installations, but the record is unclear how many of those included a demineralization system.[2] On January 31, 1978, Mr. Alburty sold the trade name Raco and other company assets to Tom White and Roger White. The Whites then formed Raco Car Wash Systems, Inc. Since 1978, the sale of Raco automatics has exceeded five million dollars and the sale of demineralization systems has exceeded one million dollars.

10. As early as the fall of 1972, Mr. Alburty began using the phrases "NO SPOT" and "NO SPOT RINSE" to identify his demineralized rinse system and the service delivered by that equipment. Since that time, those phrases have appeared in sales brochures, trade magazines, instructional signs, and radio commercials. The testimony admitted at trial establishes that the brochures and magazine advertisements have been directed primarily at prospective purchasers of car wash equipment. Conversely, the location of the instructional signs in the self-service bays and at the exits of the automatic bays are designed to attract the attention consumers of car wash services. Likewise, the radio advertisement broadcast in Joplin, Missouri during the month of September, 1974 was intended to encourage automobile owners to use Raco car wash services.

11. Following the sale of the company in 1978, Raco continued to use the terms "NO SPOT" and "NO SPOT RINSE" to identify its demineralized rinse system and the service it provides. In addition to the traditional use of these slogans in brochures, signs at the point of use, and industry publications, Raco used them in advertisements printed in the *Wall Street Journal* and *Entrepreneur* magazine. The plaintiff offered evidence that since 1978 it has expended over two hundred thousand dollars for advertising, but the percentage

---

**2.** In his deposition, Mr. Alburty admitted that his records of equipment sales were incomplete.

of that amount used to promote the terms "NO SPOT" and "NO SPOT RINSE" is not clear. Despite these efforts, the plaintiff was not allowed to enter the mark "NO SPOT RINSE SYSTEM" on the principal register of the United States Patent and Trademark Office (USPTO). Nonetheless, on August 20, 1985, it was allowed to register that mark on the USPTO supplemental register.

12. Similarly, in 1982, Raco began using a stylized pictorial representation of a "little car" on the towel vendor that it manufactures. Thereafter, on March 24, 1987, the plaintiff was allowed to register that symbol as a service mark on the USPTO principal register.

13. Originally, the operation of the Raco automatic was controlled by an electro-mechanical relay-based control panel. In 1984, Raco began using a control mechanism known as an industrial programmable controller which functions based on information stored in its memory module. As sold by its manufacturer, this device has the capacity to direct any number of industrial procedures; so, it was necessary for Raco to compose a computer program to adapt the controller to its specific needs. Raco asked Jack Lauber, one of its employees, to write a computer program for this purpose, and to aid Lauber in accomplishing this task, Raco paid for him to attend a seminar on computer programming. Subsequently, Lauber created a new program entitled the "Allen–Bradley Modular Automation Controller Ladder Diagram" (Lauber Program) to operate the components of the Raco automatic.

14. Thereafter, Raco used the Lauber Program in all its newly manufactured automatic equipment, but it did not otherwise publish the work. Furthermore, the record indicates that Raco did not begin to affix copyright notices to the memory module until late 1987. On March 28, 1988, Raco obtained a copyright registration for the computer program. In July and August of that year, Raco mailed letters asking all those who purchased automatic equipment containing the Lauber Program before late 1987 to affix a copyright notice to the memory module.

15. Defendant Walter Smith initially used the phrase "NO SPOTS" in 1975. At that time, Smith and Jerry Harper purchased a Raco automatic with a demineralized rinse system for use in their car wash located on Grand Avenue in Galesburg, Illinois. In addition to the Raco automatic, that facility was equipped with self-service bays containing machinery manufactured by Harper's company, J.H. Systems. Harper's deposition indicates that the phrase "NO SPOTS" appeared at this facility on a sign posted at the exit of the automatic bay. This sign was designed by Harper and produced by an independent sign manufacturer in Eureka, Illinois.

16. Subsequently, in 1977 Smith first offered a demineralized rinse in the self-service bays of his East Moline, Illinois location. The automatic equipment and the demineralization system were manufactured by Raco and the self-service equipment was produced by J–H Systems. To apprise customers of this feature, Smith began using instructional signs in the self-service bays which described the service as a "NO SPOT RINSE". As above, these signs were purchased from J.H. Systems which had obtained them from an independent manufacturer.

17. During the ten year period following his entrance in the car wash business, Smith continued to purchase automatic equipment and water treatment systems from Raco for the various entities in which he owned an interest. By January, 1985, Smith owned over twenty Raco automatics with demineralization systems and ten additional demineralization systems. At this time, Smith decided that he could not expand his business any further without recruiting some executive personnel. Hence, in February, 1985, Bill Stieren began work as the Chief Financial Officer of SMS. Stieren's first priority in his new position was to review the internal procedures of the corporation and investigate alternatives for expansion.

18. In May, 1985, Stieren and Smith met with representatives from Raco to discuss

their expansion plans. Historically, Smith had received significant discounts on equipment purchased from Raco, but neither Stieren nor Smith was familiar with the precise operation of the pricing structure; thus, the purpose of their visit to Joplin was to secure this information. At that meeting, Roger White informed Stieren and Smith of Raco's plans to begin franchising Raco equipment under the trade name "SPOT NOT", and asked them if they were interested in purchasing a franchise. Moreover, White asked if Stieren and Smith would agree to purchase soap and other similar supplies from Raco in return for significant discounts on equipment. The evidence indicates that Stieren and Smith were not interested in either of these proposals and so they did not place an equipment order at that time.

19. After meeting with the Raco representatives, Stieren and Smith felt that Raco's franchising plans were in conflict with their expansion plans so they began investigating the availability of other means of acquiring the equipment they desired. To this end, they contacted their attorney, John Cepican, to determine if they could construct a copy of the Raco automatic for their own use. Additionally, Stieren and Smith asked one of their employees, Walter Dykeman, to contact the suppliers and fabricators needed to replicate the Raco equipment. Although the record contains evidence that there were a number of design options available to the defendants, they never considered an alternate design for their equipment.

20. While waiting on a response from his attorney, Stieren mailed a letter to Raco dated July 17, 1985 soliciting bids to supply the equipment for three new facilities. On July 25, Raco promptly tendered a bid for those projects. In the meantime, Stieren had received an opinion from Cepican stating that the design of Raco's equipment could be copied. On July 31, 1985, after considering the relative merits and demer-

its of these options, the principals of SMS decided to produce their own automatic car wash equipment by duplicating the Raco design.

21. The prototype of what would later become known as the Galesburg automatic was installed in the car wash owned by Stieren and Smith in Coal Valley, Illinois. Aside from various minor changes and a Galesburg label [3], the following components of the Galesburg prototype appeared virtually identical to the Raco automatic: the signs mounted above the entrance to the bay, the currency meter, the wheel wash assembly, the guide rails, the guide light, the trolley, and the monorail track. Of these, the signs above the bay are the only components readily visible from the public street. The testimony of car wash owners such as Kendall Smith exhibits that consumers of car wash services make the decision to use a particular facility before turning off of the public street.[4] Similarly, although the Galesburg demineralization system appears virtually identical to the Raco demineralization equipment, that machinery is not seen by the car wash consumer.

22. Immediately after the prototype was installed at the Coal Valley facility, Stieren and Smith rejected Raco's July 25 bid and informed Raco of their intent to purchase equipment from another supplier. Nonetheless, the letter communicated an interest in continuing to purchase replacement parts from Raco. The record indicates that Raco was receptive to this arrangement and that SMS purchased a substantial amount of replacement parts from Raco after October 1, 1985.

23. In late October, 1985, Stieren and Smith formed Galesburg to manufacture copies of the prototype for installation in the facilities that SMS planned to open in Peoria, Illinois, North Charleston, South Carolina, and Mount Pleasant, South Carolina.

---

**3.** The record reveals that some of the Galesburg automatics were initially sold without a decal.

**4.** This conclusion is premised entirely on the witness' direct observation that very few auto-

mobile owners leave the public street and enter his business premises without purchasing a car wash.

24. Some time thereafter, Galesburg began using the a pictorial representation of a "little car" on its towel vendors. However, at this time the defendants were unaware that the plaintiff claimed the exclusive right to use the "little car" logo. In August, 1986, the plaintiff informed the defendants of its objection to this conduct, and in deference to Raco's demands, the defendants immediately stopped using that symbol.

25. Except for the defendants' use of the slogans "NO SPOT" and "NO SPOT RINSE" and employment of those slogans by a few independent car washes, the record indicates that the plaintiff enjoyed primary use of those terms until 1985. Then, at some point after Galesburg was formed, the defendants began to use those phrases to refer to the demineralized rinse provided by Galesburg equipment. The record reveals that these terms are used on instructional signs inside the self-service bays and near the exit of the automatic bays. These signs are not visible from the public thoroughfare and are only visible to the car wash consumer after she has decided to use a particular facility.[5]

26. Originally, Galesburg was organized to manufacture equipment solely for use in facilities owned by Stieren and Smith; however, in March, 1987, Galesburg began to sell equipment to third parties. The evidence establishes that Galesburg has never solicited sales to third parties and that all such transactions are initiated by the purchaser. Defendant Stieren testified that since Galesburg does not have any promotional literature, prospective purchasers are invited to Galesburg, Illinois to view the manufacturing site and a functional car wash outfitted with Galesburg equipment. Of the seventeen Galesburg automatics in operation, nine are owned by persons or entities other than the named defendants.

27. Also, the defendants copied the Lauber program for use in the prototype's computerized control mechanism. Notice of the plaintiff's copyright was not affixed to the memory module from which the program was copied, and so the defendants did not have actual or constructive knowledge that their conduct infringed that copyright. In November, 1987, Galesburg developed a new program to serve this purpose and began phasing out its use of the Lauber program. The defendants received notice of the plaintiff's copyright claim in August, 1988, but, by that time, they had ceased all use of the Lauber program.

## CONCLUSIONS OF LAW

1. The court has personal jurisdiction over the parties to this action.

2. The amount in controversy exceeds ten thousand dollars ($10,000.00).

3. The court has jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and the doctrine of pendent jurisdiction.

## THE TRADEMARK CLAIM

4. Initially, the plaintiff alleges a cause of action for trademark infringement of its "little car" logo and the terms "NO SPOT" and "NO SPOT RINSE". Generally, to prevail on this claim, Raco must establish that it owns a legally enforceable interest in those marks and that the defendants' use of them creates a likelihood of consumer confusion. The defendants admit that the plaintiff has a legally cognizable interest in the "little car" logo, but they dispute that Raco has such an interest in "NO SPOT" and "NO SPOT RINSE".

5. Raco did not have enforceable rights in the slogans "NO SPOT" and "NO SPOT RINSE" at the time of its original use of the terms. Generally, "[t]he law recognizes priority arising out of use of a fanciful or arbitrary trademark, but ... words which ... emphasize the qualities of the article ... are intitially invalid and nonregistrable trademarks." 3 Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 19.25 (4th ed. 1983). Here, the record demonstrates that "NO SPOT" and "NO SPOT RINSE" are words which describe the character of the final

**5.** *See,* fn. 4.

rinse provided by the plaintiff's equipment. Therefore, due to the descriptive nature of these slogans, they were initially nonregisterable and unprotectible at common law.

 6. Nevertheless, the plaintiff avers that it owns rights in "NO SPOT" and "NO SPOT RINSE" because those phrases have subsequently acquired secondary meaning. A mark has acquired secondary meaning if, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Kramer Manufacturing Company Inc. v. Andrews,* 783 F.2d 421 (4th Cir.1986). The secondary meaning of the mark must be evident at the time that the defendant began to use the same or a substantially similar mark. 3 Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 19.25 (4th ed. 1983). Evidence that the defendant intentionally copied a product feature or term is sufficient to establish a prima facie case of secondary meaning and shift the burden of production to the defendant. *Kramer,* 783 F.2d at 448. Absent such evidence, the following factors are useful in determining whether a mark has acquired secondary meaning: "long use; advertising; sales volume; and identity of source or origin in the minds of the purchasing public." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, fn. 3 (4th Cir.1984), *citing Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.,* 371 F.Supp. 900 (W.D.Ark.1974).

 7. Regardless of whether the relevant point of reference is 1975 or 1985, the plaintiff has failed to establish that the words "NO SPOT" and "NO SPOT RINSE" have secondary meaning.[6] The plaintiff is not entitled to a presumption of secondary meaning because the record does not indicate that the defendants intentionally copied these slogans. Walter Smith and Jerry Harper reached their decision to use these phrases at the Grand Avenue facility without consulting Ray Al-

burty or Raco, and each subsequent use of "NO SPOT" and "NO SPOT RINSE" by the defendants was independent of the plaintiff's use of those phrases.

8. Further, consideration of the factors discussed in *Pizzeria Uno* yields a similar result. The evidence clearly demonstrates that the plaintiff, and its predecessors, have continuously used the terms "NO SPOT" and "NO SPOT RINSE" since the fall of 1972. Also, since 1978, the plaintiff has generated a substantial amount of revenue from its sale of demineralization systems. Conversely, the evidence pertaining to the plaintiff's promotion of these marks is not as definite. Ray Alburty testified that he used these phrases in correspondence, promotional literature, instructional signs, and radio advertisements, but there is no indication of the extent or expense of these efforts. Similarly, the testimony of Tom White demonstrates that he and his brother have used the slogans in brochures, instructional signs, press releases, and industry publications. However, aside from general estimates of the number of brochures distributed and the amount of funds allocated to the promotion of "NO SPOT" and "NO SPOT RINSE", there is no conclusive evidence of the cost of these efforts or the number of consumers contacted. Lastly, the evidence does not establish that purchasers of car wash equipment and purchasers of car wash services identify those slogans with Raco or its equipment. Hence, the plaintiff has not produced sufficient evidence to establish that "NO SPOT" and "NO SPOT RINSE" have secondary meaning.

9. The plaintiff's attempt to establish a legally enforceable interest in "NO SPOT" and "NO SPOT RINSE" must fail for another reason. In addition to proving that consumers associate these terms with Raco or its equipment, the plaintiff must demonstrate that "a significant part of the consuming public has come to accept the name as the exclusive property right of the plain-

**6.** Since the plaintiff has failed to demonstrate that the terms have secondary meaning, the court will not decide whether the secondary meaning must have been apparent before the

defendants' first use of the slogans or before their first use of the terms to describe Galesburg equipment.

tiff." 3 Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 19.26 (4th ed. 1983). Other than oblique references to its area of operation, the plaintiff has not defined the relevant segment of the consuming public that supposedly associates these terms with its product. Further, there is no probative evidence that a significant portion of these consumers accept that Raco has the exclusive right to use "NO SPOT" and "NO SPOT RINSE". Consequently, the plaintiff has not discharged his burden of proving a cognizable interest in those phrases.

■ 10. As noted above, the defendants admit that Raco owns a legally enforceable interest in its "little car" logo, and thus, the record must be examined to determine if their use of a similar mark created a likelihood of consumer confusion. To determine if there is a likelihood of confusion, courts consider the following factors: the strength or distinctiveness of the mark; the similarity of the two marks; the similarity of the goods/service the marks identify; the similarity of the facilities the two parties use in their businesses; the similarity of the advertising used by the two parties; the defendant's intent; and any evidence of actual confusion. *Pizzeria Uno,* 747 F.2d at 1527. Of these, the court in *Pizzeria Uno* focused primarily on the strength or distinctiveness of the mark as measured by reference to the following classifications which are listed in ascending order of strength: generic; descriptive; suggestive; or fanciful. *Id.*

■ 11. Reflection upon these factors demonstrates that there is a substantial likelihood of confusion between the "little car" logo used by Raco and the similar mark formerly used by the defendants. There can be no doubt that the plaintiff's "little car" logo is a fanciful mark, and so it is very distinctive. The logo formerly used by the defendants was strikingly similar to the plaintiff's mark, and both marks were used to identify the same goods and services. While the record exhibits variation in the cosmetic appearance of car wash

facilities, the basic structural elements of the defendants' facilities closely resembles those of the plaintiff's car washes. Both the plaintiff and the defendants used the "little car" logo on towel vendors to promote the sale of disposable towels. The record contains no direct evidence bearing on the defendants' intent in using the logo, and likewise, there is no evidence of actual confusion. Nevertheless, the balance of these factors demonstrates a significant chance that consumers would be commercially confused by the defendants' use of the "little car" mark. Thus, the plaintiff is entitled to judgment against the defendants for their improper use of the "little car" logo.

### THE TRADE DRESS CLAIM

■ 12. Second, the plaintiff claims that the defendants have infringed its rights in the trade dress of its automatic car wash equipment. To establish a case of trade dress infringement Raco must demonstrate that the overall appearance of its automatic car wash has acquired secondary meaning and that the defendants' use of that trade dress is likely to confuse purchasers of car wash equipment and/or purchasers of car wash services. *Kramer Manufacturing Company, Inc. v. Andrews,* 783 F.2d 421, 448–449 (4th Cir.1986). If the plaintiff presents evidence of intentional, direct copying by the defendants, then the burden shifts to the defendant to prove that the trade dress does not have secondary meaning. *Id.* Moreover, in *Kramer* the court indicated that a likelihood of confusion may also be presumed when the plaintiff proves that the defendant intentionally copied its trade dress. *Id.* at 449, fn. 24.

■ 13. Presently, while there is abundant evidence that the defendants intentionally manufactured a direct copy of the Raco automatic, the defendants have successfully rebutted the presumption of secondary meaning with respect to purchasers of car wash services.[7] The fact

---

7. Although the Fourth Circuit Court of Appeals has not conclusively ruled on the issue, the factors outlined in the *Pizzeria Uno* case will be

used to determine the presence or absence of secondary meaning.

that the appearance of the Raco automatic has remained virtually unchanged for approximately twenty years indicates that the trade dress may have acquired secondary meaning. Correspondingly, the sale of over five million dollars worth of automatic equipment since 1978 adds some credibility to the plaintiff's position. However, the record reflects that the plaintiff has not expended a significant amount of effort to advertise the appearance of its automatic car wash equipment, and that most of this activity has been directed at equipment purchasers rather than purchasers of car wash services. Additionally, *although purchasers of car wash equipment identify the appearance of the Raco automatic with the plaintiff, consumers of car wash services do not.* Hence, the trade dress of the plaintiff's automatic equipment has secondary meaning only to purchasers of car wash equipment.[8]

14. Also, the plaintiff may not recover for trade dress infringement because the defendants have rebutted the presumption that their trade dress is likely to confuse purchasers of car wash equipment. The evidence of record indicates that the trade dress of the Raco automatic is distinctive, that the Galesburg automatic closely resembles that of the Raco, that both marks are used to identify car wash services, and that both are employed at similar facilities. However, while the plaintiff engages in some promotion of its trade dress, the defendant does not publicize the appearance of its machinery. Further, the defendants copied the design of the Raco automatic to prevent the administrative difficulties that would arise from installing and maintaining two different types of automatic equipment, and not to deceive equipment purchasers. Lastly, the record contains no convincing evidence of actual confusion. Rather, as all sales of the Galesburg automatic are initiated by the customer and each prospective purchaser is invited to view the manufacturing facility and an op-

erating installation, the purchaser is aware of the source of the equipment that he purchases. Although it is a close question, the court concludes that the defendants use of a trade dress similar to that employed by the plaintiff does not create a likelihood of confusion among equipment purchasers.

## THE COPYRIGHT INFRINGEMENT CLAIM

15. Next, the plaintiff asserts that the defendants' use of the Lauber program to operate their automatic equipment infringed its rights in that work. Essentially, to establish this claim the plaintiff must demonstrate ownership of the copyright and copying by the defendant. *Keeler Brass Co. v. Continental Brass Co.,* 862 F.2d 1063 (4th Cir.1988). The defendants do not seriously contest that the plaintiff owns a copyright in the Lauber program or that they appropriated the work for use in their own equipment. Nevertheless, they assert that the copyright claim must fail because the plaintiff did not affix a notice of copyright as required by 17 U.S.C. § 401(a).

16. Despite the plaintiff's failure to affix a copyright notice on the copies of the Lauber program distributed to the public, its subsequent conduct has preserved the validity of its copyright. 17 U.S.C. § 405(a)(2) states that

[t]he omission of the copyright notice prescribed by sections 401 through 403 from copies or phonorecords publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if—registration for the work has been made before or is made within five years after publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public ... after the omission has been discovered. . . .

In 1984, the Lauber program was initially distributed without a copyright notice af-

---

**8.** Having concluded that the plaintiff's trade dress does not have secondary meaning to purchasers of car wash services, there is no need to

decide if the defendants' use of an almost identical trade dress is likely to confuse that group.

fixed. This practice continued until late 1987 at which time Raco began placing a copyright notice on the memory module of all automatics sold. On March 28, 1988, Raco obtained a copyright registration for the program, and by August of that year, it had mailed notice of its copyright to all those who had purchased a copy of the work without notice of the copyright. Raco's knowledge that the program was being sold without a copyright notice did not inject the work into the public domain because it was sold in a form that could not be readily deciphered by consumers. Therefore, as Raco has fulfilled both the registration and reasonable effort requirements of § 405(a)(2), it owns a valid copyright in the Lauber program that was infringed by the defendants.[9]

17. Nonetheless, the plaintiff cannot recover damages against the defendants for their unauthorized use of the Lauber program. 17 U.S.C. § 405(b) states that

[a]ny person who innocently infringes a copyright, in reliance upon a authorized copy or phonorecord from which the copyright notice has been omitted, incurs no liability for actual or statutory damages under section 504 for any infringing acts committed before receiving actual notice that registration for the work has been made ..., if such person proves that he or she was mislead by the omission of notice.

Prior to the fall of 1987, the plaintiff sold automatic equipment containing copies of the Lauber program to which no notice of copyright was affixed. One of these systems was purchased by the defendants and used as the model for the Galesburg prototype installed in Coal Valley, Illinois in October, 1987. The defendants believed that the absence of notice indicated that Raco was not claiming the exclusive right to use the Lauber program. Thereafter, in November of that same year, the defendants composed a new computer program

to operate the components of its automatic equipment. By the time that the defendants received actual notice of the plaintiff's copyright, they were no longer using the Lauber program. Since the omission of notice mislead the defendants into infringing Raco's copyright and the infringing conduct ceased long before the defendants received actual notice of the copyright registration, § 405(b) insulate them from pecuniary liability.

## THE UNFAIR TRADE PRACTICES ACT CLAIM

18. Fourth, and finally, the plaintiff seeks to recover against the defendants under the South Carolina Unfair Trade Practices Act (SCUTPA). § 39–5–140(a) creates a private right of action in favor of "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by § 39–5–20...." S.C.Code Ann. § 39–5–140(a) (Law. Co-op. Pub. Co. 1985). § 39–5–20 declares that unfair methods of competition and unfair or deceptive acts or practices are illegal. *Id.* at § 39–5–20(a). Because SCUTPA is designed to emulate 15 U.S.C. § 45(a)(1), courts are directed to seek guidance from prior judicial interpretations of that act when construing SCUTPA. *Id.* at § 39–5–20(b). Moreover, South Carolina courts have concluded that an unfair or deceptive act is not actionable under SCUTPA unless it has an impact upon the public interest. *Noack Enterprises, Inc. v. Country Corner Interiors*, 351 S.E.2d 347 (S.C.App.1986). Normally, unfair or deceptive acts or practices sufficiently impact the public interest if they have the potential for repetition. *Id.* at 351.

19. To the extent that Raco's unfair trade practices act claim is premised upon the defendants' use of the terms "NO SPOT" and "NO SPOT RINSE", the claim

9. At trial, the defendants offered some testimony tending to support the proposition that Lauber, not Raco, is the owner of the copyright in the Lauber program. However, the court is of the opinion that Raco owns the copyright be-

cause the work was made for hire as provided in 17 U.S.C. § 201(b). *See, Community for Creative Non–Violence v. Reid,* — U.S. —, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

is without merit because the evidence does not establish that the defendants' conduct was deceptive or otherwise wrongful. Likewise, since the defendants' replication Raco's trade dress was not unlawful, the plaintiff may not base its unfair trade practices claim upon that conduct. However, the defendants improper use of the "little car" logo is both deceptive and sufficiently detrimental to the public interest to give rise to liability under SCUTPA. Also, even though the defendants are insulated from pecuniary liability under the copyright statute, their misappropriation of the Lauber program is an unfair act that adversely affects the public interest. Nevertheless, neither the use of the "little car" logo or the Lauber program was willful as that term is defined in S.C.Code Ann. § 39–5–140(d). Consequently, the plaintiff is entitled to judgment on this claim, but it is not entitled to treble damages.

CONCLUSION:

Accordingly, based upon the foregoing, it is

ORDERED, that the Clerk of Court enter judgment in favor of the defendants on the trademark claim relating to the defendants' use of the terms "NO SPOT" and "NO SPOT RINSE". It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the plaintiff on the trademark claim relating to the defendants' use of the "little car" logo. It is

ORDERED FURTHER, that the defendants be enjoined from using the "little car" logo in conjunction with the sale of car wash systems, equipment, and services. It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the defendants on the trade dress claim. It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the plaintiff on the copyright infringement claim. It is

ORDERED FURTHER, that the defendants be enjoined from using the plaintiff's copyrighted computer program. It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the plaintiff on the unfair trade practices act claim.

AND IT IS SO ORDERED.

## ON POST–TRIAL MOTIONS

This case returns for our consideration based on the post-judgment motions of both the plaintiff and the defendants. The original action charged the defendants with trademark infringement, trade dress infringement, unfair trade practices, and copyright infringement. Defendant Galesburg Manufacturing Company asserted a counterclaim seeking a declaration that it did not infringe any of the plaintiffs' rights and that the plaintiff's U.S. trademark # 1,356,031 was invalid. In an order dated July 21, 1989, the court ruled for the plaintiff on the trademark claim relating to the defendants' use of the "little car" logo, the copyright infringement claim, and the unfair trade practices act claim. The court ruled for the defendants on the trademark claim relating to the defendants' use of the terms "NO SPOT" and "NO SPOT RINSE" and the trade dress claim. *Raco Car Wash Systems, Inc. v. Smith*, No. 87–1967, Slip Op. (D.S.C. July 21, 1989).

In its post-trial motion of August 7, 1989, Raco requests, pursuant to Fed.R.Civ.P. 52(b), that this court amend its findings, make additional findings, and amend the court's judgment based upon these amended and additional findings with respect to "NO SPOT RINSE", the trade dress claim, and the claim under the South Carolina Unfair Trade Practices Act ("SCUTPA"). In the alternative, Raco requests a partial new trial under Fed.R.Civ.P. 59(a) for the purposes of introducing additional evidence relating to the use, promotion and advertising of the term "NO SPOT RINSE" and to the alleged willfulness of defendants' copying and use of the "little car" logo. In a supplemental memorandum to its Rule 52(a) motion, Raco also requests that the court consider several events which occurred following entry of judgment. Defendants essentially contend all this maneuvering is little more than an attempt to relitigate the trial.

Defendants also made a post-trial motion, filed August 3, 1989, to amend and reconsider the court's judgment. Specifically, the defendants request the court reconsider the part of the order which concluded that the defendants' misappropriations of the Lauber program constitute a violation of the SCUTPA. At oral argument, Raco contended that the defendants' motion was not timely filed, but that even if it had been, the defendants had adequate notice of this issue, and they consented to try the question.

First, the court will consider Raco's motion to amend the findings, make new findings, and amend the judgment. Raco has listed over twenty findings of the court that Raco would like done differently. However, it received one reasonable determination of the facts in this case and that is enough.

The "primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the court as a basis for the conclusions of law and judgment entered therein." *United States v. Carolina Eastern Chemical Co.*, 639 F.Supp. 1420, 1423 (D.S.C.1986). As defendants point out in their memorandum in opposition to this motion, the courts have consistently held that a trial court need not make a finding on every single detail raised during the trial. *See, e.g., Falcon Equipment Corp. v. Courtesy Lincoln Mercury, Inc.*, 536 F.2d 806, 808 (8th Cir.1976). That idea makes sense, too. If a trial court was required to make a finding of fact on every detail of each case, very little else would get done. If the spirit of Rule 52 requires findings and conclusions sufficient to indicate the basis of the court's decision, this court's order of July 21, 1989, more than adequately satisfies the rule.

The court, however, does find two points which need a little attention. First, under Conclusion of Law 13 on page 20 of the order of July 21st, fourteen lines down, the court used the word "services" where it meant "equipment." That sentence should read: "Additionally, although purchasers of car wash equipment identify the appearance of the Raco automatic with the plaintiff, consumers of car wash services do not." Second, during the trial, the testimony did not clearly reveal that one NO SPOT RINSE system serviced an entire car wash installation. We now accept this statement. Therefore, in Finding of Fact 9, the court agrees to let the order reflect that Mr. Alberty sold eighty-one (81) automatic car wash units and forty-one (41) NO SPOT RINSE systems between 1971 and 1978. For the same reason, in Finding of Fact 17, the second sentence will also be changed to read: "By January, 1985, Smith owned approximately twenty Raco automatics distributed amongst ten car wash locations, all of which were equipped with the Raco NO SPOT RINSE system." Unfortunately for the plaintiff, these small changes do not change the court's conclusions in this case.

In addition to challenging the original factual findings of the court, the plaintiff also seeks to change the factual findings by introducing evidence through new testimony. As the court stated in *United States v. Carolina Eastern Chemical Co.:* "A party who failed to prove his strongest case is not entitled to a second opportunity by moving to amend a finding of fact and a conclusion of law." 639 F.Supp. at 1423. Raco had an opportunity to adduce testimony at trial. It is too late now.

Lastly, Raco requests the court to consider whether two events occurring on August 22, 1989 and September 12, 1989, should have affected this court's decision as to the status of NO SPOT and NO SPOT RINSE. Specifically, on August 22, 1989, the United States Patent and Trademark Office granted Raco registration, on the trademark principal register, of the mark NO SPOT, registration number 1, 552, 605. In addition, on September 12, 1989, pursuant to 15 U.S.C. § 1062, Raco's service mark NO SPOT RINSE was published in the official gazette of the Patent and Trademark Office. In response, defendants contend again that this "new evidence" is merely another attempt to circumvent the court's decision of July 2, 1989.

The court has discretion to consider events occurring after trial in grant-

ing a Rule 59 motion. *See Hardage v. Herring National Bank*, 837 F.2d 1319, 1321 (5th Cir.1988). We find no reason to do so here. Under Rule 59, a court may grant a new trial based on newly-discovered evidence which probably will affect the outcome of the trial. However, "[n]ewly discovered evidence must be of facts *existing* at the time of trial. The moving party must have been excusably ignorant of the facts despite using due diligence to learn about them." 11 C. WRIGHT & A. MILLER, *Federal Practice and Procedure* § 2808 at 55–57 & n. 96 (1973). In this case, the facts complained of were not in existence at the time of trial and, as the defendants contend, to the extent that they did exist at the time of trial, Raco was clearly not excusably ignorant of them.

The second motion we address today is the defendants' motion to amend the judgment. Defendants move to amend that part of the order which concluded that defendants misappropriated the Lauber program under the SCUTPA.[1] The defendants make two main arguments. First, defendants contend there is no violation of the public interest. In finding a violation of the SCUTPA, this court said that the defendants' "misappropriation of the Lauber program is an unfair act that adversely affects the public interest." *Raco Car Wash Systems, Inc. v. Smith*, No. 87–1967, Slip Op. at 25 (D.S.C. July 21, 1989). A violation of the SCUTPA requires the court to find the act had a sufficient impact on the public interest. *See Noack Enterprises, Inc. v. Country Corner Interiors*, 351 S.E.2d 347 (S.C.App.1986). Defendants contend that they would never again use the Lauber computer program because they have developed a superior program. They argue, therefore, that there is no potential for violation of the public interest and, thus, no violation of the statute. However, the *Noack* court did not limit the test for acts against the public interest under SCUTPA to those having "the poten-

tial for repetition." 351 S.E.2d at 351. The court merely concurred that, at the least, any act with the potential for repetition could also violate the public interest. The language the court chose, even aside from the fact that it was a state appellate court, does not preclude this court's earlier ruling.

The second argument the plaintiff makes is that the defendants failed to plead or litigate this issue. Rule 15(b) of the Federal Rules of Civil Procedure allows the court to amend the complaint if the issues not raised in the pleadings have been tried by the parties' express or implied consent. *See also, Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1043 (4th Cir.1986). The court finds that the plaintiff consented by implication to this issue, especially in light of the testimony of Stephen Apsey which discussed the defendants use of the computer program. Therefore, it is

ORDERED, that plaintiff's motion to amend the findings in this court's order filed July 21, 1989, be, and it is hereby, granted in part by the amending of Findings of Fact 9 and 17 and Conclusion of Law 13 as set forth hereinabove. It is

ORDERED FURTHER, that the remainder of plaintiff's motion to amend the findings, to make additional findings, and to amend the judgment be, and it is hereby, denied. It is

ORDERED FURTHER, that defendants' motion to amend and reconsider the judgment be, and it is hereby, denied.

AND IT IS SO ORDERED.

---

**1.** At oral argument on October 24, 1989, the plaintiff contended that the defendants' motion for reconsideration had not been timely filed. The motion was filed with the court in a timely fashion on August 3, 1989. However, plaintiff

received the motion five days later due to an oversight by defendants. Nevertheless, the court will assume, without deciding, that the motion was timely since the court has decided to deny the defendants' motion.